WORTH, APPELLANT, *v.* HUNTINGTON BANCSHARES, INC., APPELLEE.

[Cite as Worth *v.* Huntington Bancshares, Inc. (1989),
43 Ohio St. 3d 192.]

(No. 88-185—Submitted February 22, 1989—Decided June 21, 1989.)

*Schneider, Smeltz, Huston & Ranney, Danny R. Williams, James I. Huston* and *Sharon L. Sobol,* for appellant.

*Walter, Haverfield, Buescher & Chockley, James E. Betts, Michael T. McMenamin* and *Frederick W. Whatley,* for appellee.

WRIGHT, J. We must decide two issues in the instant case. The first is whether the lower courts correctly held that Worth was not entitled to the economic benefits provided in his employment agreement. The second is whether Worth should be indemnified for his legal expenses regardless of his success in enforcing the other provisions of the agreement. We answer both questions in the affirmative. Accordingly, the judgment of the court of appeals is affirmed in part and reversed in part.

Worth's employment agreement provided that it would be binding on the successors and assigns of both parties.[1] Huntington does not dispute

---

[1] "9. *Successors and Assigns.* This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and shall be binding

that, as the successor to UCC, it is bound by the agreement. Thus, the question is whether Worth is entitled to recover under the terms therein, specifically under Sections 2 and 3.

Section 2 listed numerous benefits to which Worth would be entitled if his employment were terminated involuntarily within one year following a change in control. These benefits included two times his annual salary, payable in monthly installments over a two-year period; two times the amount he was to receive under the company's Incentive Compensation Plan; comprehensive medical coverage for two years, or the cost thereof; payment for two years of club dues and special assessments; monthly payments for rental of an automobile; lump-sum cash payment for purchase of an annuity, or the benefits to which he has a vested right under the company's pension plan; and the option to surrender his stock to the company for cash.[2]

Section 3 of the agreement provided as follows:

"3. *Resignation Within Two*

---

upon and inure to the benefit of Employee and his legal representatives, heirs, and assigns."

[2] "2. *Termination Within One Year*. In the event that the employment of Employee with the Company or UCB is terminated involuntarily within one year after a change in control occurs:

"(a) Employee shall be entitled to receive an amount of cash equal to two times his annual salary at his then current rate. Such amount shall be paid in equal monthly installments over a period of 24 months, the first such installment to be paid within ten days after termination.

"(b) Employee shall be entitled to receive an amount of cash equal to two times .the amount that would have been awarded to him under the Incentive Compensation Plan of the Company, pursuant to the terms of such Plan as in effect immediately prior to such change in control and regardless of whether such Plan may have been changed thereafter, for the then current calendar year if such award were based on 100% of his partnership share under said Plan for such calendar year. Such amount shall be paid at the same time as awards are paid to other participants in said Plan if such Plan shall have been continued but in no event later than January 31 of the calendar year following that year in respect of which the award was to have been paid.

"(c) Employee shall continue for a period of 24 months to be covered at the expense of the Company by the same or equivalent hospital, medical, accident, disability and life insurance coverages as he was covered by immediately prior to termination of his employment; provided, however, that the Employee may elect to be paid in cash within 30 days after termination of his employment an amount equal to the Company's or UCB's cost of providing such coverages during such period.

"(d) The Company or UCB shall continue for a period of 24 months to pay Employee's monthly dues and special assessments, if any, of any Club of which Employee was a member at the time of termination and of which the Company or UCB was paying such dues and shall permit the Employee to continue to use such membership thereafter, without reimbursement to the Company or UCB of any membership or initiation fees or assessments, so long as Employee wishes to do so on the basis that monthly fees and special assessments will thereafter be paid by him.

"(e) The Company or UCB shall for a period of 24 months pay to Employee a monthly sum equivalent to the monthly rental charge of the Company-assigned or UCB-assigned automobile used by him immediately prior to termination of his employment.

"(f) Within 30 days thereafter, the Company or UCB shall pay to Employee in a lump sum an amount of cash, net of all federal, state and local income taxes, which shall be sufficient to enable Employee to

*Years.* In the event that Employee should determine in good faith that his status or responsibilities with the Company or UCB has or have diminished subsequent to a change in control, and shall for that reason resign from his employment with the Company or UCB within two years after such change in control, Employee shall be entitled to receive all of the payments and enjoy all of the benefits specified in Section 2 hereof."

The parties agree that under the terms of the agreement a "change in control" occurred on July 2, 1982.[3] Also undisputed is the fact that Huntington did not terminate Worth's employment within the meaning of Section 2, but that Worth tendered his resignation within two years of the change in control as provided in Section 3. Thus the pivotal questions center on whether, under the language of Section 3, Worth made a good faith determination that his status and responsibilities had diminished, and whether such determination was the reason for his resignation.

The trial court determined that Worth's responsibilities had *not* diminished following the takeover. In the court's view, the fact that the importance of the energy division of HBNO was reduced in relation to other divisions and that Worth became less active in generating loan business did not constitute a diminution of responsibilities. As to Worth's status, the

---

purchase a paid-up annuity issuable by a financially sound and reputable insurance company providing for payment beginning at age 65 of a monthly benefit equal to that which Employee would have received under the Company's pension plan as in effect immediately prior to such change in control (with all payment options as provided for in such plan) had all of the benefits credited to his account under said pension plan to the date of termination of his employment been fully vested. Notwithstanding the foregoing, if at the time of his termination Employee is fully vested under the Company's pension plan, then Employee shall receive the benefits he is entitled to under, and pursuant to the terms of, such pension plan and the preceding sentence shall be inapplicable.

"(g) Employee may elect to surrender to the Company his rights in all outstanding stock options (whether or not then exercisable) then held by him and, upon such surrender, the Company shall pay to him an amount in cash per optioned share equal to the difference between (i) the option price of such share and (ii) the weighted average price per share in connection with such acquisition of control if such control was acquired by the payment of cash or the then fair market value of the consideration paid per share if such control was acquired for a consideration other than cash."

[3] The agreement provided the following as to when a change of control had occurred:

"1. *Change of Control.* The provisions of Section[s] 2 and 3 of this Agreement shall become operative upon a change in control of the Company, as hereinafter defined. For purposes of this Agreement, a 'change in control' shall be deemed to have occurred if and when:

"(a) Any person or group of persons acting in concert shall have acquired ownership of or the right to vote or to direct the voting of shares of capital stock of the Company representing 30% or more of the total voting power of the Company, or

"(b) The Company shall have merged into or consolidated with another corporation, or merged another corporation into the Company, on a basis whereby less than 50% of the total voting power of the surviving corporation is represented by shares held by former shareholders of the Company prior to such merger or consolidation, or

"(c) The Company shall have sold substantially all of its assets to another corporation or other entity or person."

court indicated that all indicia of Worth's status had remained the same or increased, but that since he had not been promoted to Chief of the Engineering Section he may have believed that there had been a slight diminution in his status. In any event, citing reasons other than those given by Worth for his decision, the court ruled that Worth had failed to prove that the diminution in status was his reason for resigning.

On appeal of these findings, Worth argued, *inter alia,* that the trial court had erroneously defined "status," "responsibility," and "diminished," as those terms are used in the agreement, and that the court erred in ruling that his reasons for resigning were other than as he described. The court of appeals overruled both of these assignments of error, rejecting Worth's argument that the basis for testing whether his determination that his status had diminished was made in good faith should be purely subjective, and that he had resigned solely because of such a determination.

We agree with the courts below that contractual obligations such as Worth's employment agreement are valid and enforceable, an issue we expressly left open in our earlier review of this dispute. *Worth* v. *Aetna Cas. & Sur. Co., supra,* at 240, 513 N.E. 2d at 256, fn. 1. In upholding the agreement, the court of appeals overruled Huntington's assignment of error on the issue, and Huntington has not appealed the issue to this court. Nevertheless, it is clear that resolution of this question is an implicit prerequisite to resolving the other issues presented. Accordingly, we must begin our analysis by addressing this threshold question.

This case presents the court with its first opportunity to address the enforceability of corporate employment agreements commonly known as "golden parachutes." In general, "golden parachutes" are defined as "agreements between a corporation and its top officers which guarantee those officers continued employment, payment of a lump sum, or other benefits in the event of a change of corporate ownership." *Schreiber* v. *Burlington Northern, Inc.* (1985), 472 U.S. 1, 3, fn. 2.

At trial in this case there was much concern over the use of the term "golden parachute" and its pejorative connotations. We see no problem with the use of that term in describing contracts such as the one at issue here. As other courts have noted, "[t]he term 'golden parachute' is not by itself legally significant, nor is it legally conclusive. It is merely descriptive of a certain type of employment contract given to top corporate executives * * *." *Koenings* v. *Joseph Schlitz Brewing Co.* (1985), 126 Wis. 2d 349, 360, 377 N.W. 2d 593, 599. Accord *Royal Crown Companies, Inc.* v. *McMahon* (1987), 183 Ga. App. 543, 545, 359 S.E. 2d 379, 381.

Much has been written about this form of agreement, principally as to its use as a defense against hostile takeovers. See 2 Winter, Stumpf & Hawkins, Shark Repellants and Golden Parachutes: A Handbook for the Practitioner (1985) 432, fn. 1. Proponents of such contracts identify at least three primary benefits: (1) attraction and retention of competent managerial personnel, (2) promotion of executive objectivity by ensuring continued financial security, and (3) effective deterrence of hostile takeover attempts. Opponents argue that these potential benefits are illusory, and that golden parachutes operate solely for the benefit of executives and at the expense of shareholders. See, generally, Note, *Koenings* v. *Joseph Schlitz Brew-*

*ing Co.*: The Wisconsin Supreme Court Addresses Executive Termination Benefits in a Golden Parachute Contract (1987), 1987 Wis. L. Rev. 823, 827-835; Note, Golden Parachutes and the Business Judgment Rule: Toward a Proper Standard of Review (1985), 94 Yale L.J. 909, 914-922 (hereinafter "Note, Golden Parachutes and the Business Judgment Rule").

Recent decisions contain numerous arguments against the enforceability of golden parachute agreements, including: (1) that such contracts are void as against public policy; (2) that they are unenforceable for lack of consideration; (3) that the benefits provided are penalties and not valid liquidated damages; and (4) that such contracts bear the taint of a conflict of interest in favor of the managerial beneficiaries and to the detriment of shareholders. In some early cases courts reached a decision on procedural issues, such as standing, without reaching the merits of these arguments. See cases cited in Comment, Testing the Flight of the Golden Parachute: Judicial Smooth Sailing or Turbulence Ahead? (1984), 11 N. Ky. L. Rev. 519, 521, fn. 15. However, in a few recent cases where the merits have been considered, golden parachute agreements have been upheld. See *Koenings, supra; Royal Crown Companies, Inc., supra.*

Since these agreements will vary greatly, we can make no broad pronouncement as to their validity other than to say that an agreement such as the one executed by UCC and Worth is most certainly not void as against public policy. A corporation's decision to enter into a golden parachute agreement is, like all other matters dealing with compensation of corporate executives, within the sound discretion of the corporation's board of directors. The court of appeals here specifically found that Worth's agreement was neither excessive nor tainted by executive self-dealing or conflict of interest. See Note, Golden Parachutes and the Business Judgment Rule, *supra*. We see nothing in the record to cause us to disturb these findings. It is certainly not for this court to second-guess the business judgment of corporate executives. Thus we hold that an agreement between a corporation and its officer which guarantees to the officer continued employment or economic benefits following a change in corporate ownership is not void as against public policy. Accordingly, we hold that the employment agreement at issue is valid and enforceable.

Turning to the agreement's use of "diminished," "status," and "responsibilities," we find that the trial court correctly interpreted and applied these terms. The trial court's opinion does not give a precise definition of the word "diminished," but there is nothing in the record to suggest that this term was restrictively interpreted in a manner contrary to its ordinary meaning. The court's definitions of "status" and "responsibilities" were consistent with their ordinary meanings, and their application in this case is amply supported by the evidence. We agree with the court of appeals that any claim of error in the trial court's use of these terms is pure conjecture.

The real crux of Worth's argument lies in his claim that the court should have completely deferred to Worth's subjective determination that his status and responsibilities had diminished and that he resigned for that reason. The fact that the contract provided certain benefits upon Worth's "good faith" determination required the trial court to examine the subjective bases of Worth's decisions. However, this does not require the

court to ignore evidence which conflicts with Worth's claimed reasoning. In some situations lack of good faith is synonymous with "bad faith," a term more frequently defined. However, this is certainly not true in all situations. See, *e.g., Kalain* v. *Smith* (1986), 25 Ohio St. 3d 157, 159, 25 OBR 201, 202-203, 495 N.E. 2d 572, 574 (construing R.C. 1343.03[C] and holding that, "A party may have 'failed to make a good faith effort to settle' even when he has not acted in bad faith."). Moreover, in all cases a "good faith determination" requires at least to some extent that the determination be informed. Where a contract provides that entitlement to benefits thereunder is contingent on a party's good faith determination, a court reviewing that party's good faith determination should consider not only the party's subjective reasoning but also the facts and circumstances surrounding the determination. An individual claiming to make a good faith decision cannot ignore the surrounding circumstances which ought to bear on that decision. Here, there is ample evidence to support the conclusion reached below that Worth's purported reasons for determining that his status and responsibilities had diminished were both speculative and uninformed.

In any event, the trial court's conclusion that Worth resigned for reasons other than a determination that his status had diminished is amply supported by the record. The evidence reveals several other reasons for the resignation: (1) a desire to leave the banking industry; (2) a desire to return to Massachusetts and commence an energy consulting business; and (3) a recognition that his continued employment with HBNO would no longer be guaranteed under Section 2 of his employment agreement, as the one-year protection provided therein was to end shortly after the day he tendered his resignation. The trial court's findings in this regard are supported by competent, credible evidence, and we will not overturn these findings.

Accordingly, we conclude that, because Worth did not resign because he in good faith determined that his status and responsibilities had diminished following the takeover, Worth was not entitled to the benefits provided in paragraphs two and three of his employment agreement. Appellant's first three propositions of law are without merit.

In his fourth proposition of law, Worth argues that the right to indemnification of legal expenses provided in the employment agreement is enforceable regardless of his entitlement to the other benefits provided therein.[4] Relying on our earlier decision in

---

[4] "5. *Enforcement Costs.* The Company is aware that upon the occurrence of a change in control the Board of Directors or a stockholder of the Company may then cause or attempt to cause the Company to refuse to comply with its obligations under this Agreement, or may cause or attempt to cause the Company to institute, or may institute, litigation seeking to have this Agreement declared unenforceable, or may take, or attempt to take, other action to deny Employee the benefits intended under this Agreement. In these circumstances, the purpose of this Agreement could be frustrated. It is the intent of the Company that Employee not be required to incur the expenses associated with the enforcement of his rights under this Agreement by litigation or other legal action because the cost and expense thereof would substantially detract from the benefits intended to be extended to Employee hereunder, nor be bound to negotiate any settlement of his rights hereunder under threat of incurring such expenses. Accordingly, if following a change in control it should appear to

*Worth* v. *Aetna Cas. & Sur. Co., supra,* the court of appeals below held that the provision for indemnification of attorney fees was valid. However, because Worth did not prevail at trial or on appeal in his effort to recover the other benefits provided in the agreement, the court of appeals held that he was not entitled to indemnification of his legal expenses.

After having held in *Worth, supra,* that such an indemnification provision is valid, we now hold that the provision in Worth's agreement is not contingent on his success in enforcing the agreement's other provisions. Section 5 states that "* * * the Company irrevocably authorizes Employee from time to time to retain counsel of his choice at the expense of the Company * * * to represent Employee in connection with the initiation or defense of any litigation or other legal action * * *." This section further provides that the "reasonable fees and expenses of counsel selected from time to time by Employee as hereinabove provided shall be paid or reimbursed to Employee by the Company on a

regular, periodic basis * * * up to a maximum aggregate amount of $500,000." The provision's clear intent is to guarantee full indemnification of Worth's legal expenses incurred in enforcing or defending the agreement regardless of his ultimate success. While Worth was not successful in this endeavor, his legal expenses were indisputably incurred in an attempt to enforce the agreement. Nothing in Section 5 suggests that successful enforcement or defense is a prerequisite to recovery of attorney fees, and we decline to read such a condition into the contract absent a showing that Worth acted in bad faith or that he prosecuted this action with no colorable claim of success.

Accordingly, we hold that where a contract provides for indemnification of legal expenses incurred by a party in enforcing or defending same, but does not make such indemnification contingent on success in enforcing the contract's other provisions, the party is entitled to indemnification of his legal expenses incurred in enforcing the contract notwithstanding his lack of suc-

---

Employee that the Company has failed to comply with any of its obligations under this Agreement or in the event that the Company or any other person takes any action to declare this Agreement void or unenforceable, or institutes any litigation or other legal action designed to deny, diminish or to recover from, Employee the benefits intended to be provided to Employee hereunder, and that Employee has complied with all of his obligations under this Agreement, the Company irrevocably authorizes Employee from time to time to retain counsel of his choice at the expense of the Company as provided in this Section 5, to represent Employee in connection with the initiation or defense of any litigation or other legal action, whether by or against the Company or any Director, officer, stockholder or other person affiliated

with the Company, in any jurisdiction. Notwithstanding any existing or prior attorney-client relationship between the Company and such counsel, the Company irrevocably consents to Employee entering into an attorney-client relationship with such counsel, and in that connection the Company and Employee agree that a confidential relationship shall exist between Employee and such counsel. The reasonable fees and expenses of counsel selected from time to time by Employee as hereinabove provided shall be paid or reimbursed to Employee by the Company on a regular, periodic basis upon presentation by Employee of a statement or statements prepared by such counsel in accordance with its customary practices, up to a maximum aggregate amount of $500,000."

cess, provided that the party has not acted in bad faith or with no colorable claim of success. Thus we hold Worth is entitled to full reimbursement of his legal expenses as provided in Section 5 of the agreement, and in this regard the court of appeals' judgment is reversed.

For the foregoing reasons, the judgment of the court of appeals is affirmed in part and reversed in part, and this cause is remanded to the trial court for further proceedings.

*Judgment affirmed in part, reversed in part and cause remanded.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, H. BROWN and RESNICK, JJ., concur.