**Andre LAUNOIS, Plaintiff,**

v.

**MIDLAND–ROSS CORPORATION, Forstmann Little & Co., Forstmann Little & Co. Subordinated Debt and Equity Management Buyout Partnership II and MRC Acquisition Corp., Defendants.**

**No. 88 Civ. 1140 (BN).**

United States District Court, S.D. New York.

Nov. 23, 1990.

Faust, Rabbach & Stanger (David Faust and Anthony Cheh, of counsel), New York City, for plaintiff.

Fried, Frank, Harris, Shriver & Jacobson (Ira Sacks and Deborah Shapiro, of counsel and Louis D. Mattielli, Gen. Counsel for FL Aerospace), New York City, for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade sitting as a United States District Court Judge by designation.

### INTRODUCTION

Andre Launois ("Launois"), a resident and citizen of France, brings this diversity action alleging breach of an Employment Agreement entered into between Launois and defendant Midland–Ross Corporation ("Midland–Ross") dated July 16, 1986.

Launois requests recovery of: (1) cash bonuses of between $70,000 and $120,000 per annum for 1987 and 1988, with interest, pursuant to the Second Proviso in § 3.1(b) of the 1986 Employment Agreement as it applies to the FL Aerospace Corporation Executive Incentive Compensation Plan (the "1987 Plan")[1]; (2) a declaratory judgment that Launois' pension benefits in accordance with § 4.2 of the 1986 Employment Agreement should be calculated by including the bonuses mentioned heretofore as well as $360,000 compensation Launois was paid in 1987 for assisting in the sale of Midland–Ross' thermal systems businesses and assets to Compagnie de Fives Lille ("Fives Lille"); (3) miscellaneous benefits amounting to $92,000 under § 3.1(d) of the 1986 Employment Agreement; and (4) recompense for legal fees and disbursements of $127,000 in compliance with § 11.4(b) of the 1986 Employment Agreement. Launois seeks a joint and several judgment against defendants contending that Forstmann Little & Co. ("Forstmann Little") assumed Midland–Ross' contractual obligations following Forstmann Little's acquisition of Midland–Ross by means of a leveraged buyout consumated in September of 1986.

Defendants respond that Launois is not entitled to any bonuses for 1987 and 1988,

any miscellaneous benefits, or recompense for legal fees under the terms of the 1986 Employment Agreement. Further, defendants argue that Launois erroneously contends that the allegedly unpaid bonuses and payment of $360,000 should be included in the base for determining Launois' pension calculations pursuant to § 4.2 of the 1986 Employment Agreement, and that Launois' request for a declaratory judgment to that effect should be denied. Defendants therefore request dismissal of all claims.

Jurisdiction is founded on diversity of citizenship, 28 U.S.C. 1332(a) (1982). The amount in controversy, exclusive of interest and costs, exceeds $10,000, the jurisdictional amount required at the time this action was instituted. Venue is proper in accordance with 28 U.S.C. 1391(a), (c) (1982).

■ Under § 11.5 of the 1986 Employment Agreement which stipulates that the parties are to be governed by the laws of the state of Ohio, the substantive law of Ohio applies. As a matter of course, New York courts give effect to contractual choice of law clauses. *See e.g., Freedman v. Chemical Constr. Corp.,* 43 N.Y.2d 260, 372 N.E.2d 12, 401 N.Y.S.2d 176 (1977); *Compagnia de Inversiones Internacionales v. Industrial Mortgage Bank of Finland,* 269 N.Y. 22, 198 N.E. 617 (1935), *cert. denied,* 297 U.S. 705, 56 S.Ct. 443, 80 L.Ed. 993 (1936); Restatement (Second) of Conflicts of Laws § 187.

This matter was tried to the court without a jury. In accordance with Rule 52, Fed.R.Civ.P., the court makes the following Findings of Fact and Conclusions of Law:

### BACKGROUND

Launois, a former executive employee of Midland–Ross, commenced employment in France in 1958 with an industrial firm

---

1. At trial Launois also sought bonus compensation allegedly unpaid in 1987 and 1988 under two bonus programs instituted by Midland–Ross for the benefit of its corporate executives. These programs were named Management Incentive Compensation Plan and Executive Performance Plan. In his post trial brief, however,

Lanois admitted that as of the 16th of July, 1986 (the effective date of the 1986 Employment Agreement) these bonus programs had been terminated by Midland–Ross and thus Lanois abandoned his claim for bonus compensation in connection with these plans (plft.'s post-trial brief, p. 12).

known as Stein & Roubaix. In 1968, Stein & Roubaix was restructured into several subsidiaries, one of which was called Stein–Heurtey. This subsidiary was involved with the sale and engineering of industrial furnaces, mainly for the steel industry and for heavy metallurgy. In 1971, Launois became Chairman and Chief Executive Officer of Stein–Heurtey; Midland–Ross, which already had a joint venture relationship with Stein–Heurtey through its surface combustion division, became a minority shareholder of Stein–Heurtey, and by 1975 Midland–Ross had acquired the remaining shares of Stein–Heurtey.

*The 1984 Employment Agreement*

In 1984 Launois moved to Cleveland, Ohio from Paris, France to become Executive Vice President in charge of Midland–Ross' worldwide thermal business segment, which included Stein–Heurtey. While it was not typical at that time for Midland–Ross executives to have employment agreements, Launois was very concerned about relocating his family from Europe without job security, and hence Launois and Midland–Ross entered into a formal Employment Agreement designed to assure Launois that he would work in Midland–Ross' Ohio office for at least three years. The Agreement guaranteed Launois a starting annual salary of $175,000, making him eligible to be awarded bonuses in accordance with Midland–Ross' various bonus programs: Management Incentive Compensation Plan ("MICP"), Executive Performance Plan ("EPP"), and its predecessor, Executive Incentive Compensation Plan ("EICP").

In addition, the 1984 Employment Agreement enabled Launois to participate in Midland–Ross Corporation Pension Plan for Salaried Employees ("Salaried Pension Plan") for the duration of his employment with Midland–Ross which would entitle him to monthly pension benefit payments.

*Sale of Midland–Ross*

In April or May of 1986, Midland–Ross was offered for sale, and during May and June of 1986 Harry J. Bolwell ("Bolwell"), the Chief Executive Officer and Chairman of the Board of Directors of Midland–Ross,

negotiated with several groups interested in acquiring Midland–Ross. In due course, Forstmann Little contracted to purchase a controlling interest in Midland–Ross in conformance with a certain Agreement and Plan for Merger, dated June 30, 1986. Thereafter in September of 1986, a controlling interest in Midland–Ross was acquired by Forstmann Little through one or more of its affiliates. Midland–Ross' name was changed to FL Aerospace, Inc. ("FL"), and Richard Veiser ("Veiser") became the President and Chief Executive Officer of the successor company.

*The 1986 Employment Agreement*

In May 1986, during the period that the sale of a controlling interest in Midland–Ross to Forstmann Little was in the process of negotiations, Bolwell suggested to, *inter alios*, Launois that he might wish to enter into a new Employment Agreement in order to provide Forstmann Little with flexibility in modifying existing bonus plans and to provide Launois with job security in light of the likely change of ownership of Midland–Ross. The parties agreed that Midland–Ross' attorneys, Jones, Day, Reavis & Pogue of Cleveland would draft the new Employment Agreement (Pre–Trial Order "PTO" 7).

On June 26, 1986 Frank N. Fittipaldi ("Fittipaldi"), Vice President and General Counsel of Midland–Ross, provided Launois with a draft of a proposed Employment Agreement for his review. Thereupon, Launois retained an attorney Frank Rasmussen ("Rasmussen"), of the law firm of Squire, Sanders & Dempsey of Cleveland. Launois and Rasmussen consulted on June 30, 1986 and again on July 2, 1986.

On the same day as Launois' second consultation with Rasmussen, Launois sent Fittipaldi a typed memorandum with a handwritten addendum containing various revisions that Launois desired for incorporation in the draft Employment Agreement. Essentially, Launois requested modification of two articles: one relating to Midland–Ross' supplemental retirement plan and the other relating to the assignment of contractual obligations. Launois requested these changes because he was convinced that the

Thermal Systems group would be sold to a group of foreign investors, and was concerned that the successor company might object to certain portions of the obligations proposed by Midland–Ross under the new Employment Agreement.

Prior to the execution of the new Employment Agreement, Launois traveled to France and during his stay received from Fittipaldi a second draft. Launois noted that the changes he requested had been incorporated into the second draft, and also that Article III on compensation, specifically § 3.1(b) relating to incentive compensation plans and arrangements, contained substantial modifications from the first draft. Launois did not take issue with the modified language contained in the second draft until he returned to Cleveland on July 30, 1986 and met with William Ludwig ("Ludwig"), Senior Vice President of Human Resources for FL Industries, Inc., which company was responsible for, *inter alia*, overseeing and coordinating the acquisition of Midland–Ross on behalf of Forstmann Little. During the course of discussions relating to the modified second draft, Ludwig explained that the revisions reflected in § 3.1(b) of the new 1986 Employment Agreement had been made to provide Forstmann Little with more flexibility to modify, amend or terminate existing bonus programs.

Launois also met with his attorney, Rasmussen, on July 30 to further review the new Employment Agreement, especially in light of the various proposed revisions incorporated into the second draft by Midland–Ross. Launois was advised by Rasmussen to sign the modified second draft of the 1986 Employment Agreement, and therafter Launois and Midland–Ross entered into the new 1986 Employment Agreement. The effective date was July 16, 1986 although the Agreement was actually executed sometime after July 30, 1986 when Launois had returned from Paris to Cleveland.

*Sale of Thermal Systems Group (Stein–Heurtey)*

In September 1986, Morgan Stanley & Co. ("Morgan Stanley") was retained by Forstmann Little and FL to market certain of FL's divisions, including Stein–Heurtey. On January 20, 1987 Nicholas Forstmann ("Forstmann"), one of the principals of Forstmann Little, met with Launois and requested that he assist Morgan Stanley in selling the divisions comprising the thermal systems group. Indeed, Forstmann offered to pay Launois a fee of $360,000 for assisting Morgan Stanley and Midland–Ross with the sale of the various divisions (Tr. 40–42).

Launois assisted Morgan Stanley by drafting offering materials for these divisions and by meeting with potential buyers, *viz*, with more than seven prospective buyers, including Banque Paribas (Tr. 51). On January 30, 1987—ten days after Launois was brought in to assist Morgan Stanley—FL contracted to sell a controlling interest in Stein–Heurtey and its subsidiaries to Fives Lille, a subsidiary of Banque Paribas[2]. The actual sale was consummated on March 16, 1987, and on March 25, 1987 Midland–Ross paid Launois the $360,000 compensation that Forstmann had promised Launois for assisting Morgan Stanley and Midland–Ross. After March 16, 1987 Launois did not actively work for FL, but the 1986 Employment Agreement was in effect through December 31, 1988.

## DISCUSSION

The court turns to a discussion of Launois' various claims for relief. In bringing this contract action, fundamentally, Launois bears the burden of proving, by a preponderance of the evidence, breach of contract terms and damages suffered thereby. *See e.g., Capitol Equipment Enterprises, Inc. v. Wilson Concepts Inc.*, 19 Ohio App.3d 233, 484 N.E.2d 237 (Ohio Ct.App.1984); *List & Son Co. v. Chase*, 80 Ohio St. 42, 88 N.E. 120 (Ohio 1909).

*Bonus Payments*

The court addresses Launois' first claim for allegedly unpaid bonus compensation. Under the 1984 Employment Agreement, in

---

**2.** Interestingly, Lanois is now "a chief executive    of Fives–Lille" (Tr. 42).

addition to Launois' annual salary and his entitlement to participation in Midland–Ross' pension plan, Launois became eligible to receive bonuses in accordance with the MICP, the EPP and its predecessor the EICP. While employed by Midland–Ross in the United States, Launois was paid the following bonuses under the MICP for the preceding fiscal year: January 1985 (for fiscal 1984)—$38,750; January 1986 (for fiscal 1985)—$45,000; and August 1986 (for the first half of fiscal 1986)—$25,000. The latter $25,000 payment, awarded by resolution of Midland–Ross' Board of Directors on June 30, 1986, represented approximately one half of Launois' 1985 MICP award and was the final payment made to Launois prior to the termination of the MICP bonus program.

Launois was also enrolled in the 1983–1985 EICP and received the following awards at the culmination of that three year period: 1983—$20,000; 1984—$22,500; 1985—$27,500. Thus, in January 1986, Launois received $70,000 in full and final settlement of any amounts that were due and owing under the 1983–1985 EICP. Further, Launois was awarded the following amounts under the 1984–1986 EPP: Fiscal 1984—$26,250; fiscal 1985—$32,083, and the following amount under the 1985–1987 EPP: Fiscal 1985—$35,750. On June 30, 1986, Midland–Ross' Board of Directors approved the payment of $94,083 to Launois, which sum received in July 1986, represented the total amount that had been awarded under both the 1984–1986 and 1985–1987 EPPs as of June 30, 1986.

The parties agree that Midland–Ross terminated both the MICP and the EPP in June 1986, and no additional amounts were awarded to Launois at any subsequent time under these bonus plans. Consequently, and pursuant to Launois' concession in his post-trial brief affecting the MICP and EPP bonus plans, (*see* Footnote 1, *supra*), Launois' claims relating to such bonus plans are dismissed.

With respect to Launois' remaining claim for bonus payments allegedly due him un-der the terms of the 1986 Employment Agreement, it appears that in addition to receiving his annual base salary of $208,700 in 1987 and 1988 under § 3.1(a) of the 1986 Agreement, the revised § 3.1(b) provided that Launois was entitled to, up to and including December 31, 1988:

3.1(b): continuing participation [consistent with past practices but providing proportional participation in any awards (whether granted before or after expiration of the Term) covering periods extending beyond the Term] in incentive compensation plans and arrangements in effect as of the Effective date or as the same may subsequently be modified, supplemented or replaced, without material reduction in the reward opportunities available to Executive; *provided however*[3], that subject to the prior payment by Midland to Executive of an award with respect to the period ending June 30, 1986 which is an amount equal to 50 percent of the award which was approved by the Compensation Committee of the Board of Directors of Midland at its December, 1985 meeting in respect of Executive under Midland's Management Incentive Compensation Plan, except as set forth below, this Section 3.1(b) shall be thereby rendered void and of no further force and effect, effective immediately prior to the acquisition of a majority of the then outstanding shares of Common Stock, par value $5 per share, of Midland, pursuant to the Offer, as that term is defined in the Agreement and Plan of Merger, dated as of June 30, 1986, among Midland, Forstmann Little & Co., Forstmann Little & Co. Subordinated Debt and Equity Management Buyout Partnership II and M–R Acquisition Corp.; *further provided, however*[4], that notwithstanding the foregoing, Executive shall have the right to participate in any other incentive compensation plans and arrangements of Employer providing comparable reward opportunities to Executive in which Executive may otherwise become entitled to participate

---

**3.** Hereinafter referred to as the "First Proviso".

**4.** Hereinafter referred to as the "Second Proviso".

subsequent to the date hereof (emphasis supplied).

Thus, under the First Proviso of § 3.1(b), were Launois to receive an MICP payment of $22,500 or more for the first half of 1986 representing one-half of his 1985 award under the MICP, and the Forstmann Little affiliates acquired a majority of Midland–Ross' stock, the first clause was to be "rendered void and of no further force and effect." As mentioned above, Launois received $25,000 for the first half of 1986 and Forstmann Little acquired the majority of Midland–Ross' stock in September of 1986. Consequently, then, Launois could not participate in any future bonus plans excepting those subsequently adopted by FL under the terms of the Second Proviso, quoted *supra*.

We are now called upon to interpret the Second Proviso of the 1986 Employment Agreement. In essence, the specific question is whether Launois had a right to participate in incentive compensation plans and arrangements adopted by Midland–Ross during the term of the 1986 Employment Agreement or whether such participation was discretionary with Midland–Ross. Clearly, after the acquisition of Midland–Ross, FL did adopt a bonus program for 1987 and 1988, effective January 1, 1987, the so-called 1987 Plan. Contending he had a contractual right to participate in the 1987 Plan according to the terms of the Second Proviso in § 3.1(b) of the 1986 Employment Agreement, Launois now seeks to collect unpaid bonus awards for 1987 and 1988 under the 1987 Plan. Defendants, however, maintain that Launois was properly excluded from participation under the 1987 Plan, *viz.*: (1) the 1987 Plan covered only those personnel below the level of Division President and was not meant to cover executives at Launois' level; (2) the Committee of Senior Corporate Officers appointed by the Board Of Directors of FL (the "Administrative Committee") "retained complete discretion to choose Plan Participants" and did not designate Launois as a Plan Participant for the years 1987 and 1988; and (3) even assuming the 1987 Plan did cover Launois, he was not qualified to participate because he was not a Plan Participant for the entire year of 1987. None of the foregoing contentions of defendants have merit.

### (1)

██ Defendants' first argument must be rejected since the 1987 Plan constituted an "incentive compensation plan" providing "comparable reward opportunities" to Launois (*see* Second Proviso of § 3.1(b), quoted *supra*), and was thus applicable to Launois under the relevant terms in the Second Proviso. Plainly, the express language of the 1987 Plan qualifies it as an incentive compensation plan which included corporate executives and therefore covered Launois. Article 1 of the 1987 Plan entitled "PURPOSE AND PARTICIPATION" states that:

> [The 1987 Plan] is designed to direct and motivate *Key Corporate* and Division executives for the achievement of *planned annual income* and *cash flow objectives* and the maintenance and improvement of targeted *profit margins* and *investment utilization.*
>
> *Participation is accordingly restricted to those executives of the Company* or its Operating Divisions who are in positions which enable them to *materially influence the annual financial results of the Company* in the aforementioned areas. To be entitled to annual incentive payments under the terms of this Plan, executives must have been in the full-time employ of the Company (or any of its Divisions) following their designation as Plan Participants for the entire year (emphasis supplied).

In furtherance of the express terms of the 1987 Plan, Launois' credible testimony establishes that he was one of the key corporate executives qualified to "materially influence the annual financial results" of his employer both with respect to "annual income and cash flow objectives and the maintenance and improvement of targeted profit margins and investment utilization" (Tr. 38–39).

Significantly, Ludwig, who became Director of Human Resources Administration at Midland–Ross following August 1986

and thereafter extensively reviewed Launois' Employment Agreement (Tr. 148), admitted at trial that Launois was a key corporate executive with responsibility for achieving planned annual income or cash flow objectives, and that Launois was in a position to materially influence the annual financial results of Midland–Ross or FL after the effective date of the 1987 Plan (Tr. 150–152). In sum, Launois was embraced within the group of FL personnel who were intended to be covered by the 1987 Plan.

Finally, Launois is entitled to participate in the 1987 Plan for the reason that the Second Proviso contains terms which require interpretation according to their usual connotations, and are construed in the context of the surrounding bonus compensation language. Contract provisions should be read to give them meaning and not to deprive them of any purpose. *See e.g., Garza v. Transport Marine Transport Lines, Inc.,* 861 F.2d 23 (2d Cir.1988); *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017 (2d Cir.1985). Where the language in the contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties. *NRM Corp. v. Hercules Inc.,* 758 F.2d 676, 681 (D.C.Cir.1985) *(citing E.P. Hinkel & Co. v. Manhattan Co.,* 506 F.2d 201, 204 (D.C.Cir.1974)). In Launois' situation, despite the fact that Article I of the 1986 Employment Agreement functioned as a definitional clause, the parties chose not to restrict the ordinary connotations of terms such as "comparable" or "opportunities" by means of Article I. Consequently, the terms maintain their common meaning without contractual limitation, and are construed in the context of the surrounding language concerning bonus compensation. Given this broad language construction, Launois was certainly entitled to be a participant in the 1987 Plan.

Based on all the facts and circumstances, the 1987 Plan qualifies as an "incentive compensation [plan] and [arrangement]" and the rewards available under the 1987 Plan accord Launois with "comparable reward opportunities" to obtain bonus compensation awards.

(2)

■ As to defendants' second argument, it is true that the Administrative Committee was "empowered to designate Plan Participants for each Plan year" (plft's. exh. 5). Assuming *arguendo* that the foregoing language conferred complete discretion in the Administrative Committee to designate Plan Participants, as argued by defendants, in the case of Launois the Administrative Committee's discretion was nullified by the Second Proviso of § 3.1(b) of the 1986 Employment Agreement. That Proviso conferred upon Launois "the *right* to participate in any other incentive compensation plans and arrangements of Employer providing comparable reward opportunities to Executive *in which Executive may otherwise become entitled to participate subsequent to the date hereof"* (emphasis supplied; plft's. exh. 3). Since Launois, as a key corporate executive, was qualified to participate in the 1987 Plan, and since Launois had a right under § 3.1(b) of his 1986 Employment Agreement to participate in incentive compensation plans for which he was qualified, the Administrative Committee's discretion, if any, as to the designation of Plan Participants was entirely inapplicable to Launois.

(3)

■ The court also rejects defendants' third argument, *viz.,* that Launois was not qualified to participate in the 1987 Plan because he was not "in the continuous full-time employ of the Company [FL] or a participating Division for the entire period of the year since being first designated as a Plan Participant by the Committee with respect to such year" (plft's. exh. 5).

Although Launois was never specifically designated as a Plan Participant by the Administrative Committee, Launois nevertheless should have been permitted to participate in the 1987 Plan as of the effective date, January 1, 1987 under the Second Proviso of § 3.1(b). As we have seen, Launois left the employ of FL on March 16, 1987 and thus was not with FL for the

entire period of the year 1987. Indeed, as of March 16, 1987 Launois was involuntarily terminated by FL without cause by reason of the fact that the Thermal Systems Group was sold by FL to Fives Lille. According to defendants, the termination of Launois' employment disqualified him from participation in the 1987 Plan since he was not in the employ of FL for the entire year. Under § 7.1 of the 1986 Employment Agreement, however, upon termination other than for cause, Launois was entitled to "receive all amounts of compensation and other benefits owed to Executive pursuant to Article III, IV, and V hereof." Hence, the court finds that Launois' termination of employment at FL on March 16, 1987 did not disqualify him as a participant in the 1987 Plan [5].

■ Since Launois was entitled to receive bonus compensation under the 1987 Plan and the Second Proviso of § 3.1(b), the court must ascertain whether or not Launois has established that he would have been entitled to receive a bonus under the 1987 Plan, and if so, the dollar value of the bonus. The court finds, however, that Launois failed to demonstrate that he suffered financially as a result of nonparticipation in the 1987 Plan.

Launois requests that his "compensation for 1987 and 1988 should be increased by bonuses of not less than $70,000 and not more than $120,000 per annum," arguing first that "had [he] been included in the 1987 Plan ... in keeping with his position and prior rewards, he could have earned a bonus of $70,000 per annum [or] 35% × $200,000" (plft's post-trial brief p. 17–18). Launois maintains that the 35% represents the high end of a range of reward opportunities, varying from 15% to 35%, awarded

to other 1987 Plan Participants, and the $200,000 figure approximates Launois' base salary, which was in fact $208,700, per annum for 1987 and 1988. Since Launois failed to sustain his burden of proving how *his* bonuses could have been derived and how *his* bonuses could have been calculated the court does not grant Launois' request for allegedly unpaid bonus compensation.

Although it is uncontroverted that bonuses under the 1987 Plan were based on the functions of *cash flow* and *operating earnings targets* (plft's. exh. 5; Tr. 158, 161), that awards under the 1987 Plan ranged from 15% to 35% of annual salary (Tr. 159–160), and that the highest awards were approximately $25,000 in 1987 and $35,000 in 1988 (Tr. 128), it is also uncontroverted that the personnel receiving these awards were employed *within divisions,* and the percentages were calculated based on documents reflective of *division activity.* Thus, it is completely incongruous for Launois to quantify the bonuses based on these percentages since plainly he was a corporate executive at least two steps above the level of any particular division employee. In point of fact, Launois utterly failed to offer any evidence to demonstrate the percentages he would have been given if he were eligible. On this point defendants argue, and Ludwig testified, that Launois could not have earned a bonus under the 1987 Plan even if he was designated to participate because his targets would have been on the corporate level, and corporate earnings targets were not met in 1987 and 1988 (Tr. 157–158). The court is unable to determine whether or not corporate earnings targets were met in 1987 and 1988 because Launois failed to establish the lev-

---

5. Even if Lanois' 1986 contract does not shield him from the one year requirement, at the very least the specific terms of the 1987 Plan provide Lanois with a pro rata award for the time he was employed by FL subsequent to the effective date of the 1987 Plan (Jan. 1, 1987) to the date of termination (Mar. 16, 1987). Importantly, Article 6 of the 1987 Plan entitled "PARTICIPANT RIGHTS" states in pertinent part:

In the event a Participant's employment is involuntarily terminated by the Company before the end of a Plan year for reasons other than cause or for inadequate personal performance—such as a layoff, a plant closing, or sale of a Division—the terminated Participant shall be entitled to a pro rata award payment.

Clearly, the 1987 Plan, on its face, provided for the exact type of contingency that occurred in March of 1987, and Lanois had a right to at least a pro rata apportionment of bonus payments from January 1, 1987 to March 16, 1987 in accordance with Article 6 of the 1987 Plan.

el of corporate earnings, a prerequisite to his bonus claims under the 1987 Plan formula.

To buttress his request for bonuses of $70,000, Launois relies on certain handwritten notations made in July or August 1986 by a Ms. Andreano ("Ms. Andreano's notes"; plft's. exh. 6), an employee of Midland–Ross' pension department, who projected that a portion of Launois' 1987 and 1988 bonus compensation would be $70,000 per annum. Launois' argument fails for the following reasons.

Ms. Andreano's notes merely estimated the Launois bonuses for 1987 and 1988 and only for the purpose of calculating the Launois projected pension benefits. It is obvious that Ms. Andreano's estimate of Launois' bonus compensation for 1987 and 1988 was predicated on the awards Launois had received in 1986 in accordance with the EPP and MICP, both of which were terminated in 1986. More, the evidence is clear that Ms. Andreano prepared the pension calculations in July or August 1986, well before the 1987 Plan even existed (Tr. 43–44). Since there is no evidence that Ms. Andreano predicated her calculations on the terms of the 1987 Plan, and since she was merely a clerical employee with absolutely no control over Launois' actual bonuses, the court attaches little weight to Ms. Andreano's estimates, and finds that the notes have no significance concerning Launois' contractual rights respecting entitlement to awards under the 1987 Plan. Therefore, Launois has not sustained his burden of a right to bonuses of $70,000.

Launois also seeks bonuses amounting to $120,000 by reasoning that since in 1986 he received $70,000 for his regular super bonus and $25,000 for incentive compensation [6], he had a right to receive a "comparable reward opportunity" in 1987 and 1988. One basis for Launois' request for greater bonuses is Ms. Andreano's notes. The court has found, however, that Ms. Andreano's notes made prior to the 1987 Plan do not support Launois' claim for bonus compensation.

Additionally, Launois relies on a memorandum sent by Bolwell to Launois on July, 1, 1987 (the "Bolwell Memo") which was offered in evidence by Launois without objection (Tr. 30). That memorandum states in pertinent part that, under the 1986 Employment Agreement, Launois would receive "essentially the same benefits which you [Launois) presently enjoy [under the 1984 Employment Agreement]" (plft's. exh. 4). Launois contends that the Bolwell Memo establishes that Launois is entitled to $120,000 since he received that amount as bonus compensation in 1986.

Despite the fact that the court admitted the Bolwell Memo in evidence without objection at trial, in their post-trial brief defendants object to the Bolwell memo on the ground that it represents extrinsic evidence to the 1986 Employment Agreement and thus falls within the limitations of the parol evidence rule (deft's. post-trial brief p. 20–22).

Defendant's post-trial objection as to the admissibility of the Bolwell Memo is plainly untimely not having been raised at trial. However, the court finds that the Bolwell Memo is of little evidentiary value. Bolwell did not participate in the drafting of the controlling bonus compensation language (deft's. exh. EE at 28–29), and significantly the memo makes no specific reference to prospective bonuses or their dollar value. It is evident the Bolwell Memo did not convey any intent that Launois would be entitled to receive any specific dollar amount of future bonus payments.

Conversely, it is clear from the language which was added to the second draft of § 3.1(b) of the 1986 Employment Agreement that the revisions were made to provide the new owners of Midland–Ross with *flexibility* regarding bonus plans, and that

---

**6.** As previously discussed, in August of 1986 Lanois was awarded $25,000 as accelerated income compensation under the MICP.

Lanois calculated the $120,000 damages figure by relying on Ms. Andreano's projection for 1987 and 1988 which simply doubled the $25,-000 amount Lanois received in August of 1986 for each ensuing year's anticipated incentive compensation. Ms. Andreano then added to that amount a projection of each ensuing year's regular super bonus ($70,000) for a total of $120,000 (plft's. post-trial brief p. 17).

Launois understood that the Second Proviso reserved Forstmann Little's flexibility to propose new bonus plans that could improve *or* worsen Launois financial situation relative to previous bonus plans (Tr. 95–98). Accordingly, the executed 1986 Employment Agreement controls the conduct of the parties, not the Bolwell Memo, and the language in the Second Proviso establishes that the parties' intent was that Launois' bonus compensation was not *guaranteed* to remain undiminished. In sum, simply because Bolwell assured Launois he would receive "essentially the same benefits" Launois did not have a right to a payment of a $120,000 bonus under the 1987 Plan.

Since Launois failed to prove the specific amount, if any, respecting the bonus to which he was entitled under the 1987 Plan, the court dismisses that portion of Launois' prayer for relief.

*Pension Benefits*

To reiterate, the court has held herein that Launois has failed to show he was entitled to bonus income under the 1987 Plan and § 3.1(b) of the 1986 Employment Agreement. Accordingly, no such bonus income is included in the base for calculating the additional pension benefit (the "Additional Pension Benefit") and the request for a declaratory judgment to that effect is denied.

■ Nor should the $360,000 paid to Launois in March of 1987 be included in the base for determining Launois' Additional Pension Benefit. Importantly, § 4.2 states that if Launois ceased to be a participant under the Salaried Pension Plan, as in fact occurred, Midland–Ross would pay Launois a monthly Additional Pension Benefit in such an amount as to provide him with the same monthly pension benefit as he would have received had he retired at age 55 with 30 years of service. Launois' average annual earnings for 1985–1988 were to be used for the purposes of calculating the Additional Pension Benefit, and *his average earnings were to include payments made under § 3.1(a) (base salary) and § 3.1(b) (incentive compensation) of the 1986 Employment Agreement* (plft's. exh. 3).

In January 1987 Launois ceased to be a plan participant under the Salaried Pension Plan by reason of the sale of Midland–Ross' thermal systems businesses and assets to Fives Lille, and by reason of Launois subsequent employment by a successor corporation, namely Forstmann Little. Moreover, it is undisputed that Launois is entitled to the Additional Pension Benefit in compliance with the terms of § 4.2. The dispute centers on the inclusion of payments other than straight salary for 1987 and 1988 in the base for determining the Additional Pension Benefit.

Launois claims that he is entitled to have the $360,000 he received in March 1987 included in the base for calculating the Additional Pension Benefit pursuant to § 4.2 because "it is, in fact, an *arrangement* and a *reward opportunity* within the literal and plain sense meaning of Section 3.1(b) of the 1986 Agreement" (plft's post-trial brief, p. 21). He reasons that the $360,000 was similar to the "stay-pay" arrangements other executives at Midland–Ross received as incentives to stay on, operate, and help sell off their divisions following the acquisition by Forstmann Little (deft's. exh. DD), thus qualifying the $360,000 as an "incentive compensation or arrangement" (Tr. 40). Defendants argue that the $360,000 was a "finder's fee" and therefore should not be included in the base for calculating the Additional Pension Benefit.

The crucial issue is not whether the $360,000 was a "finder's fee," but rather, within the literal meaning of the Second Proviso of § 3.1(b), whether or not the payment qualifies as an "incentive compensation [plan] and [arrangement] … providing *comparable* reward opportunities to Executive [Launois] in which Executive may otherwise become entitled to participate subsequent to the date hereof [July 16, 1986]" (plft's. exh. 3).

As we have seen the court has heretofore found that the parties intended for the terms "comparable" and "opportunities," to be construed according to their common meanings, and that the language "comparable reward opportunities" appearing in

the context of the entire clause concerning bonus compensation, acquires meaning from the surrounding language. The issue, then, in light of the above considerations, is whether or not the $360,000 paid to Launois "provides comparable reward opportunities" to "any other incentive compensation plans and arrangements of Employer [Midland–Ross or FL]." For the following reasons, the court holds that the $360,000 *was not* paid pursuant to an "incentive compensation [plan] and [arrangement] ... providing *comparable* reward opportunities" under § 3.1(b), and consequently *is not* included in the base for calculating the Additional Pension Benefit under § 4.2 of the 1986 Employment Agreement.

Where the terms of the contract are clear and unambiguous, the court cannot find an intent different from that expressed in the contract. *E.S. Preston Assoc., Inc. v. Preston*, 24 Ohio St.3d 7, 492 N.E.2d 441 (Ohio 1986). Here, the plain construction of § 3.1(b) establishes that the terms "comparable" and "opportunities" directly modify the phrase "other incentive plans and arrangements," and the terms were intended to give Launois the right to participate in incentive plans and arrangements so long as they "[provided] comparable reward opportunities" to any incentive plans and arrangements existing at Midland–Ross or which Midland–Ross (or FL) thereafter created for the benefit of its executives.

As previously mentioned, Launois was paid $360,000 to assist Morgan Stanley in selling Midland–Ross' thermal systems group. Assuming *arguendo*, that the $360,000 qualifies as an incentive compensation plan and arrangement, it was still *sui generis* and unprecedented. There is no evidentiary support for Launois' contention that the circumstances of the deal and the nature of the compensation were comparable in *"concept"* or *"amount"* to such plans and arrangements offered to any other employee of Midland–Ross or FL (plft's. post-trial brief p. 16–19). The evidence establishes that the $360,000 payment was a special one-time deal offered by Forstmann to Launois. Indeed, Launois

even conceded that it was a special deal outside of his contract which Launois worked out with Forstmann and Veiser (Tr. 61–62). Obviously, despite Morgan–Stanley's efforts, it could not consummate the sale of Stein–Heurtey, but Forstmann knew that Launois could accomplish the task because of his unique connections. In fact, Launois' twenty-five year relationship with Paribas (Tr. 51) was undoubtedly the reason that Stein–Heurtey was sold merely ten days after Launois was brought in to negotiate with Fives Lille, a subsidiary of Paribas.

Under all the facts and circumstances, the $360,000 paid to Launois simply does not qualify as an "incentive compensation [plan] and [arrangement] ... providing comparable reward opportunities to Executive [Launois]." The payment was made solely in return for Launois' *special* and *unique* assistance with the sale of Stein–Heurtey. It was not "comparable" to the so-called "stay-pay" arrangements or to any other awards that were available at Midland–Ross.

Launois asserts that the $360,000 was similar to a stay-pay arrangement. The court cannot agree. A stay-pay package would not have been offered to Launois because he was a corporate (and not a division employee) and because he already had an employment contract. Defendant's evidence that stay-pay packages were not offered to corporate employees or to employees covered by employment agreements was undisputed (Tr. 139–140). In addition, the $360,000 was paid pursuant to an oral agreement; there was no stay-pay letter. All stay-pay packages were paid in conformance with a letter agreement (Tr. 47, 141). Finally, Launois received all the money within a few months of when the arrangement was first discussed; he did not have to wait for more than a year to get any of it. The $360,000 payment clearly was not a stay-pay package or an arrangement comparable thereto.

The short of the matter: since it is undisputed that the $360,000 payment was not salary paid pursuant to § 3.1(a), and since the payment does not fall within the param-

eters of bonus compensation pursuant to § 3.1(b), the $360,000 is not included in the base for the purpose of calculating Launois' Additional Pension Benefit under § 4.2 of the 1986 Employment Agreement[7]. Consequently, Launois request for a declaratory judgment to that effect is denied.

*Miscellaneous Benefits*

In his third claim for miscellaneous benefits under § 3.1(d) of the 1986 Employment Agreement, Launois refers to certain perquisites to which he was entitled under the 1984 Employment Agreement: a car, health insurance and a country club membership, and seeks damages of $20,000, $70,000 and $2,000, respectively for those items (Tr. 44–46). Initially, the court addresses the claim for health insurance, and then the claims for automobile expenses and country club membership.

Health Insurance

■ The only provision in the 1986 Employment Agreement entitling Launois to health insurance benefits is § 3.1(d). According to § 3.1(d), in relevant part, Launois was entitled to the following compensation arrangements:

> 3.1(d) continuing participation, consistent with past practices, in all other employee benefit plans and practices *of Midland* in effect as of the Effective Date (including without limitation ... *health and welfare plans* ...), or as the same may be modified, supplemented or replaced without material reduction in total value of the benefits to Executive (emphasis supplied).

Significantly, § 3.1(d) refers to "continuing participation" in the *Midland–Ross Group Health Insurance Plan* (the "Group Plan") which health plan is specifically enumerated under § 2.2(e) of the 1984 Employment Agreement. Launois contends that the health insurance coverage that he was receiving at Midland–Ross pursuant to § 3.1(d) would cost approximately $70,000 to duplicate in France where Lau-

nois presently resides. The court finds that Launois has failed to substantiate the $70,000 valuation of his health insurance coverage benefits under § 3.1(d), or more importantly entitlement to some other health insurance plan in France.

Under the 1984 Employment Agreement, Launois had a right to group coverage under the Group Plan (plft's. exh. 1, § 2.2(e)(i)). The 1986 Employment Agreement entitled Launois to "continuing participation, *consistent with past practices*, in all other employee benefit plans of Midland ..." (emphasis supplied). That is all the 1986 Employment Agreement requires. Launois continues to be covered under the Group Plan (Tr. 174). However, Launois argues that Midland–Ross should provide him with the monetary equivalent of an insurance policy in France for Launois and his spouse calculated by him to have a discounted "present value" (*see* plft's exh. 7) of $70,000. He proffers that the amount would compensate for the absence of primary insurance coverage for Launois under the Group Plan. The reason for the absence of primary coverage under the Group Plan is due to the fact that France provides national health insurance benefits relegating Midland–Ross' health insurance carrier to the status of a secondary or supplemental payor, thus obligating Midland–Ross only to the extent that Launois health insurance costs exceed the national benefits accorded by France. (Tr. 175–176). Further, under the Group Plan Launois must submit his claims for supplemental benefits through FL in the United States resulting in a delay with the processing of claims (Tr. 144).

The court will not, however, rewrite the plain and unambiguous language of § 3.1(d), and permit Launois to acquire other or enhanced health insurance benefits beyond those which Midland–Ross continues to provide under the Group Plan merely because the operation of the Group Plan seemingly works a hardship on Launois

---

7. On advice of tax counsel, Lanois paid no U.S. income taxes on the $360,000 payment he received on March 25, 1987. However, whether or not such income was taxable (*see* 26 U.S.C. § 871(a)) is not determinative of whether such compensation was properly includable in calculating the base for Lanois' Additional Pension Benefit.

after his return to France. *See, S & M Constructors, Inc. v. City of Columbus*, 70 Ohio St.2d 69, 434 N.E.2d 1349 (1982). Here, there is simply no contractual provision under which Launois would be entitled to enhanced health insurance benefits under his present circumstances. Hence, the court finds that Launois has not sustained his burden of proving that Midland–Ross failed to provide Launois with any health care benefits to which he is entitled. Launois' claim for $70,000 in damages is denied.

*Automobile Expense and Country Club Membership*

■ As previously mentioned, Launois additionally seeks damages of $2,000 and $20,000 because of unpaid country club dues and Midland–Ross' failure to provide the use of a Cadillac automobile, respectively. It is undisputed that the use of a Cadillac automobile and country club membership are not expressly within the "employee benefit plans and practices" covered by § 3.1(d).

Launois maintains, nevertheless, that county club membership and the use of a Cadillac automobile were implied benefits "in effect as of the Effective Date [July, 16, 1986]" by virtue of the phrase "without limitation" in § 3.1(d), and that Launois has a right to receive such implied benefits so long as they are "consistent with past practices ... in effect as of the Effective Date" (plft's post-trial reply brief p. 9).

Defendants contend that while Launois had been entitled to use of a Cadillac automobile and a country club membership under § 2.2(b) and (c) of the 1984 Employment Agreement (plft's. exh. 1), those perquisites were separate and apart from the "employee benefits plans and practices" which were covered under § 2.2(e) and not § 2.2(b) and (c), and that only § 2.2(e) of the 1984 Employment Agreement corresponds as a parallel provision to § 3.1(d) of the 1986 Employment Agreement (deft's. post-trial brief p. 35). Alternatively, defendants argue, assuming that Launois was entitled to country club dues and use of a Cadillac automobile under § 3.1(d): (1) Launois agreed to the cancellation of his club

membership in 1987 and never demanded that Midland–Ross or FL pay any country club expenses in France (Tr. 143) and, (2) Midland–Ross did not provide cars for executives outside the Cleveland area. More, defendants maintain that even those executives in Cleveland entitled to cars were downgraded from Cadillacs to Buicks (Tr. 144–145), and that Launois failed to prove the alleged annual lease cost of a Cadillac (Tr. 46–47).

The court finds that country club membership and use of a Cadillac automobile are among the benefits Launois was entitled to under § 3.1(d) of the 1986 Employment Agreement, notwithstanding the lack of explicit references to those benefits. By using the phrase "without limitation" in § 3.1(d) the parties obviously intended to entitle Launois to more than the enumerated "benefit plans and practices." The only limitation on the inclusion of non-enumerated benefits was that they were required to be "consistent with past practices of Midland in effect as of the Effective Date [July 16, 1986]." In the Launois situation, among the benefits he had been receiving under the 1984 Agreement were country club membership and use of a Cadillac automobile. Further, Launois' testimony established that Midland–Ross continued to pay Launois' country club dues through 1987 (Tr. 45–46), but ceased providing Launois with use of a Cadillac automobile in 1987 and 1988 (Tr. 44). It is evident, however, that these benefits were "in effect as of the Effective Date" of the 1986 Employment Agreement, July 16, 1986, and thus Launois was entitled to them under § 3.1(d). The remaining issue is whether or not Launois was denied these benefits by defendants and, if so, whether or not Launois has proved the valuation of $2,000 for unpaid country club dues in 1988, and $20,000 for the lease of a Cadillac automobile for 1987 and 1988. It is clear that Launois has not proven either that defendants breached the 1986 Employment Agreement with regard to country club membership or automobile expense or the valuation of those benefits allegedly denied to him.

Respecting the allegedly unpaid club dues for 1988, the record establishes that in 1987 Launois agreed to the cancellation of his country club membership in the United States, and failed to select a new country club membership as he was required to do under the terms of the 1984 Employment Agreement (Tr. 143; plft's. exh. 1 § 2.2(c)). Moreover, while Launois baldly stated that his country club dues were $2,000 in 1988, he completely failed to substantiate the $2,000 valuation of his country club membership benefit or how much a comparable membership to that received in 1987 would cost in France in 1988 (Tr. 46). Accordingly, the court rejects Launois' valuation in the amount of $2,000 for unpaid country club dues for 1988.

Respecting the alleged lease cost of a Cadillac automobile for 1987 and 1988, while Launois was authorized the use of a Cadillac automobile under § 2.2(b) of the 1984 Employment Agreement and while Launois was entitled to the continuation of this "practice" under § 3.1(d) of the 1986 Employment Agreement, Launois similarly failed to show entitlement to the use of a Cadillac in France, nor did he submit any evidence concerning the annual lease cost of a Cadillac automobile for 1987 and 1988 substantiating the claimed valuation of $20,000 for the lease of a Cadillac. In fact, Launois admitted a complete lack of knowledge on the issue of the annual lease cost of a Cadillac automobile (Tr. 46–47). And even assuming *arguendo* that it is not possible to lease a Cadillac in France, as Launois suggests (Tr. 47), Launois completely failed to prove the cost of leasing a comparable automobile in France. Hence, the court rejects Launois' claim for breach of a contractual obligation by defendants to provide him with the lease of a Cadillac in France and respecting the allegedly unpaid lease cost of a Cadillac automobile in 1987 and 1988.

## Legal Fees

■ Finally, Launois seeks recompense for legal expenses incurred in connection with this litigation allegedly amounting to $127,000. This claim is predicated on § 11.4(b) of the 1986 Employment Agreement which states:

11.4(b) The employer shall pay and be responsible for all reasonable legal fees and expenses which the Executive may incur as a result of *the Employer's failure to perform under this Agreement* or as a result of the Employer contesting the validity or the enforceability of this Agreement (emphasis supplied).

Launois insists that he is entitled to reimbursement of his legal fees and expenses regardless of the court's decision on the other matters before it. In support, Launois relies on the Ohio Supreme Court's recent decision in *Worth v. Huntington Bancshares, Inc.*, 43 Ohio St.3d 192, 540 N.E.2d 249 (Ohio 1989). In *Worth*, the indemnification provision provided that "if ... it should *appear to Employee* that the Company has failed to comply with any of its obligations under this Agreement ..., the Company irrevocably authorizes Employee to ... retain counsel of his choice at the expense of the Company" 540 N.E.2d at 266. n. 4 (emphasis supplied). There, the court held that the provision's intent was to guarantee full indemnification regardless of the employee's success. *Id.*, at 257.

The holding in *Worth* is inapposite because the relevant indemnification provision considered by the *Worth* court was more broadly drafted than § 11.4(b) of the 1986 Employment Agreement. In the current situation, the court finds that legal fees are to be paid only for fees incurred as a result of "the Employer's [actual] failure to perform" or the Employer's contesting validity or enforceability of the 1986 Employment Agreement. Obviously, Midland–Ross has not contested "the validity or enforceability of [the 1986 Employment] Agreement," and so indemnification is only required if Midland–Ross failed to perform its contractual obligations.

But as discussed *supra*, Launois failed to establish that he was entitled to be paid any bonus benefit under the 1987 Plan and hence that defendants failed to pay Launois a bonus to which he was entitled. Second, Launois failed to prove that Midland–Ross improperly calculated Launois'

Additional Pension Benefit. Lastly, Launois' third claim that he was improperly denied health insurance, country club membership, and the lease of a Cadillac in France is without merit.

Inasmuch as Launois failed to successfully show by a preponderance of the evidence that the above mentioned claims for relief should be granted, the court accordingly denies Launois' request for legal expenses amounting to $127,000 in connection with bringing this action under § 11.4(b) of the 1986 Employment Agreement.

### CONCLUSION

For the foregoing reasons, plaintiff's claims for relief are respectively denied. The clerk of the court is directed to enter judgment for defendants dismissing the complaint.