[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Ohio History Connection v. Moundbuilders Country Club Co.*, Slip Opinion No. 2022-Ohio-4345.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4345

THE STATE EX REL. OHIO HISTORY CONNECTION, APPELLEE, *v*.

MOUNDBUILDERS COUNTRY CLUB COMPANY, APPELLANT, ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Ohio History Connection v. Moundbuilders Country Club Co.*, Slip Opinion No. 2022-Ohio-4345.]**

*Eminent domain—R.C. 163.04(B)—Good-faith purchase offer—Lack of good faith in the context of eminent-domain negotiations can be shown by presenting evidence of objectively unreasonable behavior—R.C. 163.021(A)— Exercise of eminent-domain powers must be necessary and for a public use—Inquiry into whether a taking is necessary asks whether the taking is for a public use, not whether the taking is in the best interest of the public as a whole.*

(No. 2020-0191—Submitted April 13, 2021—Decided December 7, 2022)

APPEAL from the Court of Appeals for Licking County,

No. 2019 CA 00039, 2020-Ohio-276.

_____

**DONNELLY, J.**

{¶ 1} We accepted this discretionary appeal to address a dispute over an extraordinary piece of land: the Octagon Earthworks in Newark. Appellant, Moundbuilders Country Club Company, is a private entity that wants to retain its decades-long leasehold in the earthworks. Appellee, Ohio History Connection, is a state-funded entity that wants to acquire the country club's lease interest by eminent domain so that it can establish a public park on the site and nominate it, as part of a larger interconnected collection of Hopewell Ceremonial Earthworks, for the internationally recognized World Heritage list.

{¶ 2} The legal controversy in this appeal concerns two of the statutory requirements that the History Connection must satisfy during the beginning stages of its appropriation action: (1) it must make a good-faith purchase offer for the lease interest, R.C. 163.04(B), and (2) its exercise of eminent-domain powers must be necessary and for a public use, R.C. 163.021(A). The Fifth District Court of Appeals affirmed the judgment of the Licking County Court of Common Pleas, which had held that appropriation was necessary for the purpose of turning the Octagon Earthworks into a public park and that although the History Connection's purchase offer was based on a misinterpretation of appraisal reports, the offer was not made in bad faith.

{¶ 3} The country club argues that the History Connection's evidence that it lacked bad faith does not establish good faith and that the courts below employed an incorrect, overly narrow standard in assessing the History Connection's good faith. It also argues that a governmental entity can establish that an appropriation is necessary for a public use only if it shows that its proposed use of the property would provide more of a benefit to the public than the current private use.

{¶ 4} We agree that the courts below painted an incomplete picture of the good-faith standard under R.C. 163.04(B), but we conclude that the outcome is the same under the country club's proposed standard. Further, we hold that the country

club's argument that the appropriation is not necessary is contrary to well-settled law. We therefore affirm the court of appeals' judgment and remand the cause to the court of common pleas to proceed to a jury trial on the History Connection's appropriation action.

## BACKGROUND

{¶ 5} The Octagon Earthworks are part of system of interconnected geometric earth structures, commonly known as the Newark Earthworks, that cover four-and-a-half square miles in and around Newark, Ohio. The Newark Earthworks are the largest remaining complex of earthworks in the world. These earthworks were built at the dawn of the Common Era using little more than sticks and deer bones but with a sophisticated understanding of soil engineering that allowed them to withstand thousands of years of erosion.

{¶ 6} The Octagon Earthworks align with the 18.6-year cycle of the moon's orbital path around the earth with unparalleled geometric precision at a scale that dwarfs the Great Pyramid of Giza. Of all known prehistoric earthworks in the world, it offers a unique example of human ingenuity and the perennial desire to understand the universe and its celestial bodies. The historical, archeological, and astronomical significance of the Octagon Earthworks is arguably equivalent to Stonehenge or Machu Picchu. In recognition of the importance of the Octagon and surrounding earthworks, the General Assembly enacted R.C. 5.073 in 2006 to recognize the Newark earthworks as Ohio's official state prehistoric monument.

{¶ 7} The country club has leased the property where the Octagon Earthworks are located since 1910 and has used the site for a private club and golf course. The History Connection became the owner of the land burdened by the country club's lease in 1933. The History Connection allowed the country club to renew its lease over the years, most recently in 1997. Under the terms of the deed to the property and the country club's lease, the History Connection reserved a right of public access to the Octagon Earthworks but allowed the access to be limited by

the club's "reasonable rules."

{¶ 8} In the years leading up to the appropriation action, the History Connection explored the possibility of nominating the Octagon Earthworks, in conjunction with two other Hopewell Ceremonial Earthworks in Ohio, as a World Heritage site under the auspices of the United Nations Educational Science and Cultural Organization with international recognition and legal protection. In order to qualify for the nomination and assistance by the United States National Park Service and Department of the Interior, the History Connection was informed that it would need to terminate the country club's lease and physically remove the golf course.

{¶ 9} In the spring of 2017, in an attempt to assess the value of the country club's leasehold before negotiating an early termination of its lease, the History Connection hired two real-estate appraisal companies, Samuel D. Koon and Associates and the Robert Weiler Company. Both companies conducted site visits for their appraisals during December 2017 and completed their appraisal reports in January 2018 and February 2018, respectively. The chief executive officer and executive director of the History Connection, Lox Albert Logan Jr., reviewed the reports and believed that Weiler and Koon had valued the country club's leasehold at $500,000 and $795,000, respectively. Logan used the Koon appraisal to support the History Connection's written offer to buy the country club's leasehold for $800,000. The country club did not respond to the offer.

{¶ 10} On October 18, 2018, the History Connection passed a resolution declaring its intent to appropriate the country club's leasehold interest. It proclaimed that the purpose of the acquisition was "to open the restored Octagon Earthworks for public use and benefit," to "restore the Octagon Earthworks by removing the golf course related improvements," and to "nominate the Hopewell Ceremonial Earthworks to the World Heritage List to bring global recognition to the significance of this cultural site." And on November 28, 2018, after it was

4

unable to negotiate the purchase of the country club's leasehold, the History Connection filed an appropriation action in the Licking County Court of Common Pleas.

{¶ 11} During the discovery process that followed the filing of the complaint, the attorney representing the History Connection discovered that the $500,000 figure in the Weiler appraisal was not actually the value of the leasehold interest; it was the value of the leased fee, i.e., the value of the property as encumbered by the lease. The appraised value of the unencumbered estate in fee simple in the Weiler appraisal was $2.25 million, which means that the value of the leasehold interest, though not specifically stated in the Weiler report, was implicitly appraised at $1.75 million.

{¶ 12} In its answer, the country club asserted that the History Connection had failed to satisfy certain statutory prerequisites to filing an appropriation action, which triggered an initial hearing process under R.C. 163.09(B). During the four-day hearing, the parties largely focused on the requirement that the appropriation of the land be necessary and for a public use under R.C. 163.021(A) and on the requirement that the appropriating entity submit a good-faith purchase offer prior to initiating appropriation proceedings under R.C. 163.04(B).

{¶ 13} The country club argued that appropriation of its leasehold interest was not necessary, because the History Connection would not adequately care for the property and because the country club would have allowed public access for educational and research purposes if the History Connection had made that request. It argued that the taking was not necessary for the purpose of having the property listed on the World Heritage list because the History Connection's aspiration for such a designation was speculative. The country club also argued that its positive economic impact in the community and its efforts to preserve the earthworks provided a far greater tangible benefit to the public that outweighed the hypothetical and unlikely benefit to the public that allegedly would be realized by the

appropriation.

{¶ 14} Regarding the prefiling requirement for a good-faith purchase offer, the country club asserted that Logan and the History Connection had acted in bad faith by purposefully hiding the Weiler appraisal, seeking out a new appraisal in order to lower the fair market valuation of the property, and presenting the much lower amount from the Koon appraisal in its written offer. It further argued that Logan's failure to consult an attorney regarding the appraisal was direct evidence that the offer was not in good faith.

{¶ 15} The History Connection argued that its purpose of creating a public park at the site of ancient earthworks is presumed to be a public use as a matter of law. And because the History Connection could not convert the private golf course into a public park without owning the real property in fee simple, the appropriation was necessary to fulfill the public purpose. Witnesses for the History Connection testified that members of the public had been able to informally arrange some visits to the Octagon Earthworks prior to 2003 but that the country club had increasingly denied access to the public over the last 15 to 20 years, either directly by refusing to allow people onto the site or indirectly by rendering access impossible through inconveniently timed maintenance activities.

{¶ 16} The History Connection contended that its use of an independent qualified appraiser alone established that it had made its offer in good faith. It further argued that the country club's accusation of bad faith was unfounded because Logan had made an honest mistake regarding the appraisal values. Logan testified that the Ohio History Connection asked both Koon and Weiler to appraise the leasehold value of the country club. Logan did not realize that the $500,000 figure stated in the Weiler appraisal was not the leasehold value until he was told so by the History Connection's attorney. At the time that he made the offer, Logan thought the $500,000 appraisal by Weiler was in the same ballpark as the $800,000 appraisal by Koon and that it therefore seemed like a reasonable estimate. Logan

testified that he did not make an offer of $500,000 to the country club based on the Weiler appraisal, because he decided that an offer of $800,000 was more honorable.

{¶ 17} The trial court entered judgment denying the challenges to the History Connection's authority to commence appropriation proceedings. It rejected the country club's assertion that the court should weigh the benefits of continued private use against the proposed public use as part of its necessity determination. It found that the History Connection's full ownership of the disputed land was required to allow public use and access to the Octagon Earthworks and, therefore, that appropriation of the lease interest was necessary.

{¶ 18} The trial court then addressed the good-faith requirement and asserted that the failure of good faith was the same as bad faith, citing *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276, 452 N.E.2d 1315 (1983). But the trial court held that the History Connection had made a good-faith offer because it was based on a state-certified appraiser's determination of the fair market value of the leasehold. It also held that the "mere existence of another appraisal for a higher value" did not make the History Connection's offer a bad faith offer. It further held that Logan's testimony about misinterpreting the Weiler appraisal was credible and that the misinterpretation was "completely reasonable" based on the trial court's own reading of the Weiler report.

{¶ 19} Accordingly, the trial court granted the petition to appropriate, allowing the action to move forward.

{¶ 20} The Fifth District Court of Appeals affirmed the trial court's decision. It acknowledged the country club's arguments that it would provide superior stewardship of the property and greater economic benefit to the community by maintaining its private use of the property but ultimately held that the country club's arguments did not disprove the necessity of the History Connection's acquisition for the purpose of allowing full public access and public preservation of the Octagon Earthworks.

**{¶ 21}** The court of appeals repeated the trial court's depiction of good faith as the absence of bad faith: it defined "bad faith" as involving dishonesty or other intentional misfeasance. The court stressed that a determination of good or bad faith is for the trier of fact, and it concluded that there was no basis to overturn the trial court's holding that the History Connection's purchase offer was made in good faith.

**{¶ 22}** The country club sought our discretionary review of the Fifth District's decision. We accepted the appeal on the following two propositions of law:

> In an appropriation action, the condemning authority does not meet its burden of making a "good-faith offer" by presenting evidence that it did not act in bad faith in making the offer to purchase. Rather it must show that it acted in good faith, which is more than the absence of bad faith.

> In order for a condemning authority to show that a taking is necessary for a public purpose, it must show not only that the purpose for which the property is taken is a public one, but it must also show that the taking is necessary for the public purpose by weighing all considerations that impact the public. To do so, the court may weigh competing public interests.

*See* 159 Ohio St.3d 1434, 2020-Ohio-3634, 148 N.E.3d 592.

## ANALYSIS

**{¶ 23}** The hearing on the country club's challenge to the History Connection's petition for appropriation was held under R.C. 163.09(B)(1), which allows a landowner to contest any matters related to the agency's "right to make the appropriation, the inability of the parties to agree, or the necessity for the

appropriation." The General Assembly authorizes associations such as the History Connection to appropriate "the site of any historic or prehistoric mound [or] earthworks," R.C. 1743.07. Because the History Connection passed a resolution in 2018 declaring the necessity of the acquisition, the country club bore the burden of rebutting the statutory presumption that appropriation was necessary, *see* R.C. 163.09(B)(1)(a). Regarding all other matters, including whether a good-faith purchase offer was made, the burden of proof was on the History Connection by a preponderance of the evidence. R.C. 163.021(A); R.C. 163.09(B)(1).

{¶ 24} The country club's arguments speak to the appropriate standards to apply under R.C. 163.09(B)(1) as well as to the evidence before the trial court related to those standards, and thus its arguments present mixed questions of fact and law. We review the legal questions before us de novo but defer to the trial court's findings of fact, reviewing them only for clear error. *Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, 163 Ohio St.3d 337, 2020-Ohio-5371, 170 N.E.3d 768, ¶ 37. We remain mindful that when the sovereign right of eminent domain is legislatively delegated to parties such as the History Connection, the terms of that delegation must be strictly construed. *Pontiac Improvement Co. v. Cleveland Metro. Park Dist. Bd. of Commrs.*, 104 Ohio St. 447, 454, 135 N.E. 635 (1922).

### *Good-Faith Offer*

{¶ 25} An agency seeking to acquire a property interest from a private owner through eminent domain is required under R.C. 163.04(B) to provide an owner with a written good-faith offer to purchase the property at least 30 days before it files an appropriation petition. The country club argues that the requirement of "good faith," as the term is used in R.C. 163.04(B), is a higher standard than the mere absence of bad faith and that the courts below misconstrued this standard by allowing the History Connection to prevail solely because it did not act with blatant dishonesty or ill intent. The History Connection argues that the

General Assembly defines "good-faith offer" in R.C. 163.01(J) as an offer that complies with the requirements of R.C. 163.04(B) and that its written offer, supported by a valid appraisal, constituted a good-faith offer as a matter of law under the statute.

{¶ 26} R.C. 163.01(J) states that a "good faith offer" is "the written offer that an agency that is appropriating property must make to the owner of the property pursuant to division (B) of section 163.04 of the Revised Code before commencing an appropriation proceeding." But apart from referring to a requirement that the offer must be made at least 30 days before the petition is filed, the only requirement in R.C. 163.04(B) is that the agency appropriating the property must make a "written good faith offer" to purchase before commencing an appropriation proceeding. Because R.C. 163.01(J) and 163.04(B) essentially define a "written good-faith offer" as a "written good-faith offer," those statutes present a tautology rather than a definition.

{¶ 27} Such circular language describing a statutory term "leaves us to do the best we can to give the term its 'ordinary or natural meaning.' " *United States v. Bestfoods*, 524 U.S. 51, 66, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), quoting *Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). We must discern the ordinary meaning of a statutory term not just by its general use in common parlance but also by "its placement and purpose in the statutory scheme." *Bailey* at 145. Judicial precedent and the common-law use of a term may also inform our understanding, so long as they are not inconsistent with the objectives of the legislative scheme. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989).

{¶ 28} Jurisprudence addressing "good faith" when it is used at common law or in the Revised Code provides some general insight into its ordinary meaning, but that jurisprudence also provides fertile ground for disagreement. At the very least, the parties agree, as did the courts below, that although good faith is often

portrayed as being synonymous with a lack of bad faith, the meaning of "good faith" can vary depending on the context.

{¶ 29} The Licking County Court of Common Pleas and the Fifth District focused on jurisprudence stating that good faith is the absence of bad faith. *See Frank v. Nationwide Mut. Ins. Co.*, 10th Dist. Franklin No. 02AP-1336, 2003-Ohio-4684 (holding in an action construing an employment-release agreement that bad faith is the opposite of good faith); *Hicks v. Leffler*, 119 Ohio App.3d 424, 695 N.E.2d 777 (1997) (holding in an action discussing immunity from tort liability of a political subdivision that bad faith is the opposite of good faith); *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 452 N.E.2d 1315 (1983) (holding in an action addressing an insurer's lack of good faith regarding the settlement and payment of claims that the lack of good faith is the equivalent of bad faith). The country club argues that these cases do not provide relevant guidance regarding the standard of good faith in the context of eminent domain and that other decisions of this court provide more pertinent analysis, namely, *Kalain v. Smith*, 25 Ohio St.3d 157, 159, 495 N.E.2d 572 (1986) (examining whether a party against whom prejudgment interest was awarded "failed to make a good faith effort to settle the case," as required by R.C. 1343.03(C)); *Worth v. Huntington Bancshares, Inc.*, 43 Ohio St.3d 192, 540 N.E.2d 249 (1989) (examining an employment contract that granted certain benefits contingent on the employee's good-faith determination that his responsibilities have been diminished).

{¶ 30} In *Worth*, this court acknowledged that a lack of good faith has been described in some situations as synonymous with bad faith. *Worth* at 198. But we have also rejected the notion that good faith can be disproved only through affirmative proof of a party's subjective intent to act in bad faith. *Kalain* at 159; *Worth* at 197-198. We held that in certain situations, good faith can be demonstrated by objective factors such as the party's full cooperation in the procedural matters of a claim, a rational evaluation of the risks and potential

liabilities of a cause of action, and the lack of foot-dragging or other dilatory tactics. *Kalain* at 159. Conversely, behavior that is unreasonable, uninformed, or irrational in light of the circumstances can establish a lack of good faith irrespective of the party's subjective intentions. *Worth* at 197-198; *see Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397 (1994), paragraph one of the syllabus (a party "fails to exercise good faith" when its behavior "is not predicated upon circumstances that furnish reasonable justification therefor").

{¶ 31} Our reasoning in *Kalain* and *Worth* is consistent with definitions of "good faith" and "bad faith" found in Black's Law Dictionary. The definition of "bad faith" is "[d]ishonesty of belief, purpose, or motive." *Black's Law Dictionary* 171 (11th Ed.2019). The definition of "good faith" is "a state of mind consisting in honesty in belief or purpose," "faithfulness to one's duty or obligation," or "observance of reasonable commercial standards of fair dealing in a given trade or business." *Id.* at 836. In other words, a person can demonstrate good faith through behavior that is reasonable in a particular context or that conforms with justified expectations, not just through a claim of having honest intentions. And conversely, a person can potentially demonstrate a lack of good faith by acting unreasonably or failing to meet justified expectations.

{¶ 32} Irrespective of whether one categorizes the concept of unreasonableness referred to in *Kalain* and *Worth* as falling in some kind of limbo between good and bad faith or falling within a definition of "bad faith," we hold that the objective standard articulated in *Kalain* and *Worth* is apt here. It is, therefore, appropriate to consider whether the History Connection established that it acted reasonably under the circumstances in addition to considering whether it acted honestly.

{¶ 33} The statutes governing eminent domain provide insight into the kinds of acts or omissions that are relevant to a determination of an appropriating agency's good faith or lack thereof; they set forth specific examples in the

specialized context of preappropriation negotiations of the behavior we should expect from agencies. The relevant provisions here are R.C. 163.59 and 163.041 and divisions of R.C. 163.04 other than division (B), which imposes the good-faith-offer requirement.

{¶ 34} In R.C. 163.59, the General Assembly lists several policies to promote efficiency, expediency, consistency, and public confidence in the appropriation process. Agencies are instructed to obtain an appraisal of the fair market value of the property and to proceed to do so with transparency:

> (C) Real property to be acquired shall be appraised before the initiation of negotiations, and the owner or the owner's designated representative shall be given a reasonable opportunity to accompany the appraiser during the appraiser's inspection of the property * * *. As used in this section, "appraisal" means a written statement independently and impartially prepared by a qualified appraiser, or a written statement prepared by an employee of the acquiring agency who is a qualified appraiser, setting forth an opinion of defined value of an adequately described property as of a specified date, supported by the presentation and analysis of relevant market information.

> (D) Before the initiation of negotiations for real property, the head of the acquiring agency concerned shall establish an amount that the head of the acquiring agency believes to be just compensation for the property and shall make a prompt offer to acquire the property for no less than the full amount so established. In no event shall that amount be less than the agency's approved appraisal of the fair market value of the property.

R.C. 163.59.

{¶ 35} We note that the policies set out in R.C. 163.59 are explicitly *not* prerequisites to the filing of an appropriation action. R.C. 163.52(A) ("The failure of an acquiring agency to satisfy a requirement of section 163.59 of the Revised Code does not affect the validity of any property acquisition by purchase or condemnation"). An agency's adherence or nonadherence to the appraisal and offer provisions in R.C. 163.59(C) and (D) would therefore not conclusively establish whether the agency satisfied the good-faith-offer prerequisite found in R.C. 163.04(B). Nonetheless, the appraisal and offer provisions are certainly relevant to our analysis.

{¶ 36} R.C. 163.04 and 163.041 also call attention to the importance of the appraisal process. Under R.C. 163.04(C), an agency must provide a copy or summary of the appraisal to an owner "at or before the time the agency makes its first offer to purchase the property." Under R.C. 163.04(A), an agency's notice of its intent to acquire property through eminent domain must be substantially in the form set forth in R.C. 163.041; that form states that the written offer must be based on the agency's determination of the fair market value of the property following an appraisal.

{¶ 37} The country club does not dispute that the History Connection provided an appraisal with its offer and that the offer was not less than the value quoted in Koon appraisal. The country club claims, notwithstanding the History Connection's substantial compliance with the basic requirements of the statutory scheme, that the following four acts or omissions establish a lack of good faith: (1) obtaining a second appraisal, (2) failing to notify the country club prior to the appraisers' inspections of the property, (3) failing to disclose that a second appraisal existed when making its purchase offer, and (4) failing to consult an attorney prior to relying on any dollar amounts listed in either of the appraisals. The country club argues, based on the first three factors, that the History Connection tried to

14

manipulate the process by obtaining a second, unreasonably low appraisal after it had received the first appraisal.  And the country club asserts that the fourth factor indicates that the History Connection's purchase offer was uninformed and irrational.

{¶ 38} The country club's argument about manipulation of value speaks to the exact bad-faith standard that it claims does not apply.  Moreover, the country club does not explain why it was objectively unreasonable to obtain two appraisals.  In fact, in other circumstances, multiple appraisals are sometimes required by law to determine the value of real property.  *See*, *e.g.*, R.C. 2329.17 (requiring three impartial appraisals prior to sheriff's sale of real property).  The claim that the History Connection shopped for low appraisals could demonstrate a lack of good faith, but in this case, the country club's claims are wholly unsupported by the record.  The History Connection requested both appraisals in the spring of 2017, both of the appraisers inspected the site in December 2017, and both appraisers provided reports in early 2018.  The country club makes no claim that either of the appraisers were unqualified or untruthful or that the History Connection's failure to invite the country club to accompany the appraisers during the inspections affected the valuation of the property.  The trial court and the court of appeals correctly rejected the country club's arguments on these matters.

{¶ 39} As for the fourth factor, a layperson's failure to make decisions on complex legal matters without first consulting an attorney could be considered unreasonable in many circumstances.  But when, as here, an attorney ordered two appraisals, the appraisers were told to provide the value of the leasehold interest, and a layperson was given two resulting appraisals with values stated at $500,000 and $800,000, no complex legal issue was reasonably apparent to the layperson.  Moreover, the trial judge reviewed both appraisals and concluded that Logan's interpretation of them was completely reasonable.  The trial court's reasoning is consistent with the objective good-faith standard in *Kalain*, and we have no reason

to overturn its factual findings regarding Logan's credibility.

{¶ 40} We agree with the country club that a lack of good faith in the context of eminent-domain negotiations can be shown by presenting evidence of objectively unreasonable behavior rather than evidence of subjective dishonest intent, as stated in *Kalain*. The analyses of the courts below were ultimately consistent with *Kalain*, even though those courts did not cite that case. Therefore, we decline to reverse based on the country club's first proposition of law.

### *Necessity and Public Use*

{¶ 41} A government agency is prohibited from using eminent domain to acquire any property that is not "necessary and for a public use." R.C. 163.021(A). This provision enforces our state constitution's requirement that "[p]rivate property shall ever be held inviolate, but subservient to the public welfare. * * * [W]here private property shall be taken for public use, a compensation therefor shall first be made in money * * * and such compensation shall be assessed by a jury * * *." Ohio Constitution, Article I, Section 19. The country club argues that the inquiry into whether the taking is necessary should determine not only whether the taking is for a public use but also whether the taking "is in the best interest of the public as a whole." We disagree.

{¶ 42} We note first that the country club does not dispute that the History Connection would not be able to fulfill its stated use of creating a public park if the country club maintained its control and private use of the property. Thus, the country club does not dispute that appropriating the leasehold interest would be necessary for the public use. What it does dispute is whether the government's planned use of the land would qualify as a public use.

{¶ 43} R.C. 163.01(H)(1) first defines "public use" by negation; a "public use" does not include any taking that is for conveyance to a private commercial enterprise, for economic development, or solely for the purpose of increasing public revenue. R.C. 163.01(H)(2) then states that a public park is presumed to be a public

use. This statutory presumption corresponds with a long-standing national tradition of recognizing public parks as valid public uses. *See Shoemaker v. United States*, 147 U.S. 282, 297, 13 S.Ct. 361, 37 L.Ed. 170 (1893) (taking of land for a public park is a taking for public use); *Rindge Co. v. Los Angeles Cty.*, 262 U.S. 700, 707-708, 43 S.Ct. 689, 67 L.Ed. 1186 (1923) (acquisition of land for a public park is "universally recognized as a taking for public use").

{¶ 44} Despite the well-settled notion that public parks are public uses, the country club argues that the creation of *this* public park would not serve the public interest, because the government will not adequately preserve the site and because the government wants the site only to gain a nomination for World Heritage designation, the outcome of which is far from certain. The country club further argues that merely alleging a need for a public park should not justify a taking, because doing so would encourage abusive practices such as the taking of property in the middle of a busy shopping district on a flimsy claim of a need to increase green space. The country club's first argument calls for speculation and artificially narrows the agency's stated purpose. The purpose is not to take the land and put it under a bell jar but to offer it up to the public and the world. And the decision to create a public park on land containing the Octagon Earthworks is not the kind of "land-use decision which arbitrarily singles out a parcel for different, less favorable treatment than the neighboring ones," *Penn Cent. Transp. Co. v. New York*, 438 U.S. 104, 132, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (regarding historic-designation legislation). Instead, this park will help preserve and ensure perpetual public access to one of the most significant landmarks in the state of Ohio. This is not just any green space. It is a prehistoric monument that has no parallel in the world in its "combination of scale, geometric accuracy, and precision." Ray Hively & Robert Horn, "The Newark Earthworks: A Grand Unification of Earth, Sky, and Mind," *The Newark Earthworks* 90 (2016).

{¶ 45} The Fifth District did not create a new bright-line rule that will allow

the government to overreach regarding private-property interests; it instead gave appropriate deference to the trial court's factual finding that the country club had not rebutted the presumption that appropriating the golf course was necessary to fulfill the public purpose of creating a public park.

## CONCLUSION

{¶ 46} The Ohio History Connection presented evidence to establish that it made a good-faith offer to purchase the Moundbuilders Country Club Company's lease interest, and the country club failed to offer anything other than speculation to rebut that evidence. Further, the country club failed to rebut the statutory presumption that the creation of a public park for the Octagon Earthworks constituted a public use and that the taking was necessary for that public use. Accordingly, we affirm the judgment of the Fifth District Court of Appeals, and we remand the cause to the trial court to proceed to a jury trial in the History Connection's appropriation action.

Judgment affirmed<br>and cause remanded.

O'CONNOR, C.J., and DEWINE, STEWART, and BRUNNER, JJ., concur.

FISCHER, J., concurs in judgment only.

KENNEDY, J., dissents, with an opinion.

--------------------

**KENNEDY, J., dissenting.**

{¶ 47} I dissent from the majority's decision to affirm the Fifth District Court of Appeals' judgment, which affirmed the trial court's grant of a petition for appropriation. This case should be remanded to the trial court to consider the correct factors for determining the necessity of appropriation by appellee, Ohio History Connection, of the leasehold interest of appellant, Moundbuilders Country Club. The trial court failed to consider the speculative nature of the necessity of the appropriation. Therefore, I dissent.

**{¶ 48}** In *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, this court wrote, " ' "If the public use is contingent and prospective and the private use or benefit is actual and present, the public use would be incidental to the private use, and in such a case the power of eminent domain clearly could not lawfully be exercised." ' " *Id*. at ¶ 102, quoting *O'Neil v. Summit Cty Bd. of Commrs.*, 3 Ohio St.2d 53, 58, 209 N.E.2d 393 (1965), quoting *Kessler v. Indianapolis*, 199 Ind. 420, 430, 157 N.E. 547 (1927). The trial court must determine whether the power of eminent domain was lawfully exercised here, given the doubt surrounding the ultimate public use.

**{¶ 49}** Pursuant to R.C. 163.09(B)(1)(a), "[a] resolution or ordinance of the governing or controlling body, council, or board of the agency declaring the necessity for the appropriation creates a rebuttable presumption of the necessity for the appropriation if the agency is not appropriating the property because it is a blighted parcel or part of a blighted area or slum." The History Connection here exercised its statutory power to declare necessity by resolution. The resolution issued by its board of trustees declared that the acquisition of the leasehold estate is necessary "for the preservation and improvement of the [Octagon Earthworks] for a public use." The resolution stated that it is necessary that the History Connection acquire the lease so that it can restore the Octagon Earthworks, open the earthworks to the public, preserve the ceremonial and cultural significance of the site, and nominate the site to the United Nations Educational, Scientific and Cultural Organization World Heritage List.

**{¶ 50}** The ultimate reason for the appropriation, however, is more than a nomination. The History Connection stated in its resolution, "The Ohio History Connection strongly desires the Hopewell Ceremonial Earthworks, including the Newark Earthworks, be approved for inclusion on the World Heritage List. Such an inclusion would provide historical and educational benefits to all Ohioans, as well as future generations."

**{¶ 51}** The trial court did not account for the speculative nature of acceptance of the earthworks for the World Heritage List. In its resolution, the History Connection stated that "the United States Department of the Interior will not forward the Hopewell Ceremonial Earthworks to be considered for nomination to the World Heritage List until a precise schedule is established to terminate the leasehold estate and for [the country club] to leave the Octagon Earthworks site." Moundbuilders Country Club does not dispute that. But being nominated is not an assurance that the site will be selected for World Heritage status. Between 2008 and the hearing in this matter before the trial court, only two of the five sites nominated by the United States for World Heritage designation were accepted as World Heritage sites. Further, no contract, agreement, or memorandum of understanding was submitted as evidence that the appropriation by the History Connection will result in the earthworks' designation as a World Heritage Site.

**{¶ 52}** In *Norwood*, this court determined that a city code section that allowed the city to acquire property that was "in danger" of deteriorating into a blighted area was unacceptable for eminent-domain purposes. This court wrote that the "statutory definition * * * incorporates not only the existing condition of a neighborhood, but also extends to what that neighborhood might become. But what it *might* become may be no more likely than what *might not* become. Such a speculative standard is inappropriate in the context of eminent domain, even under the modern, broad interpretation of 'public use.' " *Norwood*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, at ¶ 99.

**{¶ 53}** This court explained, "A municipality has no authority to appropriate private property for only a contemplated or speculative use in the future." *Id*. at ¶ 100, citing *State ex rel. Sun Oil Co. v. Euclid*, 164 Ohio St. 265, 271-272, 130 N.E.2d 336 (1955), citing *Cincinnati v. Vester,* 281 U.S. 439, 448, 50 S.Ct. 360, 74 L.Ed. 950 (1930).

**{¶ 54}** Here, the trial court determined that "the word 'necessary,' as used in acts conferring the right of eminent domain, does not mean 'absolutely necessary' or 'indispensable,' but, rather, 'reasonably necessary to secure the end in view.'" Licking C.P. No. 18 CV 01284 (May 10, 2019), quoting *Sayre v. Orange*, 67 A. 933 (N.J.1907). The end in view here is inclusion on the list of World Heritage Sites. And that end in view was speculative and outside the control of the History Connection.

**{¶ 55}** I would reverse the judgment of the court of appeals and remand the case to the trial court to consider the necessity of the appropriation while accounting for the speculative nature of the History Connection's ultimate use. Because the majority remands for a jury trial to determine compensation, I dissent.

————————————

Dave Yost, Ohio Attorney General, Benjamin M. Flowers, Solicitor General, Samuel C. Peterson, Deputy Solicitor General, and Keith O'Korn, Jennifer S.M. Croskey, and Eythan Gregory, Assistant Attorneys General, for appellee.

Mitchell, Pencheff, Fraley, Catalano & Boda, Joseph A. Fraley, and Joshua M. Fraley; and Reese Pyle Meyer, P.L.L., and J. Andrew Crawford, for appellant.

————————————