[Cite as *Luckey v. T&S Agriventures, L.L.C.*, 2025-Ohio-871.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

Village of Luckey

    Appellee

v.

T & S Agriventures, LLC, et al.

    Appellants

Court of Appeals No.  WD-24-024

Trial Court No.  2023 CV 0144

**<u>DECISION AND JUDGMENT</u>**

Decided:  March 14, 2025

* * * * *

Corey J. Speweik and John M. Kuhl, for appellee.

Zachary J. Murry, for appellants.

* * * * *

**DUHART, J.**

**{¶ 1}** Appellants T&S Agriventures, LLC, Timothy J. Snyder, Patricia M. Snyder, Steven C. Snyder, and Beth A. Snyder appeal the Decision and Order of the Wood County Court of Common Pleas finding in favor of appellee, the Village of Luckey ("the Village"), as to the necessity of the Village's appropriation of appellant's property and as to the validity of the Village's good faith offer. For the reasons that follow, the trial court's judgment is affirmed.

**Statement of the Case and the Facts**

{¶ 2} On March 17, 2023, the Village filed a petition to appropriate certain real property (the "Property") for the stated purpose of constructing, maintaining, and operating a public water system for the residents of the Village. The Property, which is owned by appellants, consists of approximately 72.5 acres and is the site of a former stone quarry.

{¶ 3} On April 18, 2023, appellants filed their answer to the Village's petition and specifically challenged the authority of the Village to make the appropriation, the necessity of the appropriation, and the good faith offer.

{¶ 4} The trial court conducted a necessity hearing pursuant to R.C. 163.09(B) on September 21 and 22, 2023. The court heard testimony from Cory Panning, the current mayor of the Village; Randy Bielinski, administrator and chief of police of the Village; Belinda Brooks, the former mayor of the Village; Tom Stalter, a professional engineer at Northwestern Water and Sewer District; appellant Steven C. Snyder; Michael Franklin, council president of the Village; and Edward Kidston, chief executive officer of Artesian of Pioneer ("AOP").

**Mayor Cory Panning**

{¶ 5} The Village mayor, Cory Panning, testified that in September 2022, the Village made a good faith offer of $525,000 to appellants to purchase the Property. He further testified that prior to presenting the good faith offer, the Village obtained an appraisal of the Property that listed the fair market value as being $435,000. Explaining the difference between the appraised value and the amount of the good faith offer,

2.

Panning stated, "The Village wanted to provide a value that we thought was fair, which was greater than the appraised value." He further stated that "[c]ouncil discussed the number that they wanted to pay based off the appraisal number provided, and that is the number that council agreed to ultimately provide as the offer on the property."

{¶ 6} Panning testified that the Village and appellants were unable to reach an agreement regarding the Village's purchase of the property.

{¶ 7} Panning stated that drinking water is currently provided to Village residents by way of private wells. He explained that although the Village has no water transmission infrastructure, "[t]he intention is to, once the property that we are seeking to acquire is purchased, to develop those plans to put in water lines so that way water is made available to our residents." Panning further testified that AOP, a company that is in the business of designing, consulting, and developing water treatment facilities, specifically advised the Village to secure the source of water before proceeding further in the planning of the infrastructure.

{¶ 8} According to Panning, the question of whether to provide public water to the Village "has reared its head over the years," with the Village having "always been interested at some point" in being able to provide a public water source to its residents. In addition to the considering the creation of a public water system, the Village also considered bringing in regional water.

3.

**Village Administrator and Chief of Police Randy Bielinski**

{¶ 9} Randy Bielinski, the Village administrator and chief of police, testified that in December 2017, Northwestern Water and Sewer District presented the Village with a proposal offering to provide regional water services to the Village. Bielinski further testified that the Village was not interested in the proposal.

**Former Mayor Belinda Brooks**

{¶ 10} Belinda Brooks served as mayor of the Village from 2008 to 2017. Brooks testified that no one wanted to use Northwestern Water and Sewer District to provide regional water to the Village because of the costs. Brooks further testified that during her tenure as mayor, she investigated the possibility of using the Property as a public water source. According to Brooks, the Village had considered using the Property as a potential source of water as early as the 1980s.

**Tom Stalter**

{¶ 11} Tom Stalter is a professional engineer at Northwestern Water and Sewer District. Stalter testified that Northwestern Water and Sewer District is a regional water and sewer district formed under Chapter 6119 of the Ohio Revised Code. Stalter further testified that Northwestern Water and Sewer has approximately 20,000 customers throughout Wood, Hancock, Sandusky, and Henry counties. Stalter confirmed that Northwestern Water and Sewer District had proposed providing regional water to the Village in December 2017.

4.

**Steven C. Snyder**

{¶ 12} Appellant Steven C. Snyder testified that the Property was purchased in 2005 as an investment and that appellants have made various improvements to the Property over the years. Snyder further testified that appellants began to take steps to sell the Property in 2019 and 2020, and in August 2021, they entered into an agreement with an auctioneer to sell the Property at auction on September 18, 2021.

**Council President Michael Franklin**

{¶ 13} Michael Franklin is the current council president and has served on the Village council since 2010. Franklin testified that the Village tried to purchase the Property from appellants before it went up for auction. According to Franklin, the Village made a verbal offer that was rejected by appellants. Franklin further testified that following appellants' rejection of the offer, the Village discussed acquiring the Property through eminent domain.

**Eminent Domain Proceedings**

{¶ 14} The Village sent a letter to appellants advising that "on August 17, 2021, the Council of the Village of Luckey voted unanimously to begin the process of exploring the acquisition of [the Property] for public use(s) pursuant to [Chapter] 163 [of the Revised Code]…." The letter further stated, "In compliance with [R.C. 163.03], please accept this official notice that on August 23, 2021, representatives of the Village will enter upon the above-described property for all purposes permitted by law, including but not limited to making such surveys, soundings, drillings, appraisals, and examinations as

5.

are necessary or proper for the purpose of determining whether or not the subject property is suitable for use by the Village."

{¶ 15} The Village contacted Edward Kidston of AOP to assist the Village in determining whether the Property could serve as a public water source. AOP is a water treatment company that designs and builds water systems all over the eastern United States. Kidston is the chief executive officer of AOP. Kidston testified that AOP has over 100 municipal water systems in Ohio.

{¶ 16} Kidston visited the Property with representatives from the Village. During the site visit, Kidston stated that he believed the Property was a "very viable" site for construction of a water treatment facility. Kidston advised the Village to get a certified lab analysis of the water. Kidston also recommended that the Village secure the water supply before proceeding with design, engineering, and build-out of the water treatment plant or before filing any application with the Ohio Environmental Protection Agency ("OEPA").

{¶ 17} On or about September 1, 2021, a water sample was taken by Randy Bielinski and sent to Brookside Laboratories for a certified lab analysis of the water. The lab analysis report revealed no issues that would preclude the water in the former stone quarry from being used for a water treatment plant.

{¶ 18} A copy of the lab analysis report was sent to Kidston at AOP. Kidston testified that the lab analysis report showed that "[i]t's a very good water quality for a raw water source."

6.

{¶ 19} Following receipt of the lab analysis report, AOP sent a proposal to the Village for "a complete turn-key water treatment plant sufficient in size to treat the water to OEPA standards for the Village of Luckey."

{¶ 20} AOP's proposal further states: "With this proposal, AOP will design, submit and receive OEPA approval, fabricate equipment and build a water treatment plan capable of 250,000 GPD and 125,000-gallon water storage. The Village would be responsible for supplying the raw water (quarry) for the project and supplying all distribution lines and service connections for the customers."

{¶ 21} Based on the site visit and the lab analysis report of the water, the Village deemed the Property to be a suitable site for a water treatment facility with sufficient water supply.

{¶ 22} On September 16, 2021, the Village passed Resolution No. 393 declaring its intent to appropriate the Property for the purpose of constructing and maintaining a public water supply. In relevant part, Resolution No. 393 provided:

> **WHEREAS,** the Council of the Village of Luckey has determined a need exists for the provision of potable water to the residents of the Village for the purpose of protecting the general health and welfare thereof; and
> **WHEREAS,** certain real property exists within the Village which appears to be uniquely suitable and appropriate for such purposes; and
> **WHEREAS,** Council of the Village has determined it necessary for the preservation of the public health and welfare to acquire such property.

Resolution No. 393 further resolved that "[t]he Village shall immediately serve the required 'Notice of Intent to Acquire' upon all necessary parties" as required by law.

7.

{¶ 23} On September 16, 2021, the Village also passed Resolution No. 394 authorizing a buyer's agent to act on behalf of the Village "to effectuate a purchase at public auction in an amount not to exceed the authority given her by a majority vote of Council and to thus bind the Village to said purchase of [the Property]."

{¶ 24} The buyer's agent authorized by the Village pursuant to Resolution No. 394 was not permitted to bid at the auction on September 18, 2021, and the Property remained unsold at the end of the auction.

{¶ 25} One year later, on September 21, 2022, the Village passed Resolution No. 376 reiterating its intent to acquire the Property for the purpose of constructing and maintaining a public water supply. Resolution No. 376 referenced the Village's prior Resolution No. 393, passed on September 16, 2021, wherein the Village had previously determined the necessity of the appropriation. Resolution No. 376 further resolved that "[t]he Village shall immediately serve the required 'Notice of Intent to Acquire' and the 'Good Faith Offer' upon all necessary parties" as required by law.

{¶ 26} Thereafter, the Village served appellants with the foregoing notice and a good faith offer. The notice stated that the good faith offer was "based on [the Village's] determination of the fair market value" of the Property. The notice further stated that appellants were not required to accept the Village's offer and advised:

> If you reject the offer or we are unable to come to an agreement, we may have to exercise our eminent domain authority to appropriate your property, which requires a court procedure. In a court proceeding, you may disagree with any of the following: whether the project is necessary (except in quick takes), whether the property is a public use (except in quick takes), whether your property is blighted (if applicable),

8.

and whether our offer reflects the fair market value of the property.

{¶ 27} An appraisal report dated January 11, 2022, sets forth the opinion that the fee simple market value of the Property "as of November 22, 2021" was $435,000.

{¶ 28} At the necessity hearing, Steven C. Snyder provided testimony confirming that the Village had communicated its intent to acquire the Property through eminent domain after appellants had entered into an agreement with the auctioneer to sell the Property at auction. Snyder further confirmed that the Village attempted to negotiate a purchase price, but the parties were unable to agree on an amount.

{¶ 29} After the parties were unable to agree on an amount, the Village obtained an appraisal of the Property. Snyder confirmed that appellants were provided with a copy of the appraisal and that the Village made an offer that was higher than the appraised amount.

{¶ 30} The good faith offer shows that the Village offered $525,000 to acquire the Property, which was an amount $90,000 above the amount set forth in the appraisal report.

**Trial Court Decision**

{¶ 31} After the September 2023 necessity hearing, the parties submitted post-hearing briefs. On March 20, 2024, the trial court entered its judgment denying appellants' challenges to the appropriation and ordered that the matter proceed to a compensation hearing. Specifically, the trial court found that the Village's good faith offer to appellants complied with the requirements of R.C. 163.04. In addition, the trial

9.

court found that appellants had failed to overcome the presumption of necessity arising from the Village's resolution of necessity, and that appellants had failed to meet their burden of demonstrating bad faith, fraud, or an abuse of discretion by the Village. Appellants timely filed their appeal.

## Assignments of Error

{¶ 32} On appeal, appellants assert the following assignments of error:

I. The trial court's March 20, 2024, Decision and Order permitting the appropriation of the Appellants' real property was against the manifest weight of the evidence.

II. The trial court's March 20, 2024, Decision and Order holding that the Plaintiff did not commit bad faith and an abuse of discretion in the initiation of its appropriation action was against the evidence and erroneous as a matter of law.

## Law and Analysis

## Standard of Review

{¶ 33} "'The scrutiny by the courts in appropriation cases is limited in scope,' but 'requires vigilance in reviewing state actions for the necessary restraint, including review to ensure that the state takes no more than that necessary to promote the public use, and that the state proceeds fairly and effectuates takings without bad faith, pretext, discrimination, or improper purpose.'" *Columbia Gas v. Bailey*, 2023-Ohio-1245, ¶ 57 (3d Dist.), quoting *City of Norwood v. Horney*, 2006-Ohio-3799, ¶ 69-70. "Because municipalities 'enjoy broad discretion in determining whether a proposed taking serves the public,' a trial court's review of a municipality's appropriation decision consists of

10.

whether 'the legislature's exercise of power is not beyond the scope of its authority, and that the power is not abused by irregular or oppressive use, or use[d] in bad faith." (Emphasis omitted.) *Id.*, quoting *Norwood* at ¶ 70.

{¶ 34} R.C. Chapter 163 governs the appropriation of private property for public use in Ohio. "When a trial court's decision regarding a petition for appropriation rights brought under R.C. Chapter 163 is '"supported by some competent, credible evidence going to all the essential elements of the case[, it] will not be reversed by a reviewing court as being against the manifest weight of the evidence."'" *Columbia Gas* at ¶ 60, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

### Individual Property Rights and the State's Power of Eminent Domain

{¶ 35} "The property rights of an individual are fundamental rights, and 'the bundle of venerable rights associated with property is strongly protected in the Ohio Constitution and must be trod upon lightly, no matter how great the weight of other forces.'" *Ohio Power Co. v. Burns*, 2022-Ohio-4743, ¶ 22, quoting *Norwood* at ¶ 38. However, "[l]ike the individual's right to property, the state's great power to seize private property predates modern constitutional principles." *Norwood* at ¶ 39. Indeed, "[a]t the time the Constitution was adopted, * * * [t]he founders recognized the necessity of the takings power and expressly incorporated it into the Fifth Amendment to the United States Constitution." *Id.* Nevertheless, even "though its existence is undeniable and its powers are sweepingly broad, the power is not unlimited." *Id.*

11.

{¶ 36} R.C. 163.021(A) directs that "[n]o agency shall appropriate real property except as necessary and for a public use" and that "[i]n any appropriation, the taking agency shall show by a preponderance of the evidence that the taking is necessary and for a public use." "This provision enforces our state constitution's requirement…." *State ex rel. Ohio History Connection v. Moundbuilders Country Club Co.,* 2022-Ohio-4345, ¶ 41; *see also* Ohio Constitution, Article I, Section 19.

**Good-Faith Offer**

{¶ 37} Appellants argue in their first assignment of error that the trial court's decision permitting the appropriation of the Property was against the manifest weight of the evidence because the Village's good-faith offer "was not supported by an appraisal."

{¶ 38} The Revised Code provides that at least 30 days prior to filing a petition to appropriate real property, "an agency shall provide an owner with a written good faith offer to purchase the property." R.C. 163.04(B). In addition, under R.C. 163.04(C), "[a]n agency may appropriate real property only after the agency obtains an appraisal of the property and provides a copy of the appraisal to the owner or, if more than one, each owner or to the guardian or trustee of each owner."

{¶ 39} R.C. 163.59 further provides:

> (C) Real property to be acquired shall be appraised before the initiation of negotiations, and the owner or the owner's designated representative shall be given a reasonable opportunity to accompany the appraiser during the appraiser's inspection of the property…. As used in this section, "appraisal" means a written statement independently and impartially prepared by a qualified appraiser, or a written statement prepared by an employee of the acquiring agency who is a qualified appraiser, setting forth an opinion of

12.

defined value of an adequately described property as of a specified date, supported by the presentation and analysis of relevant market information.

(D) Before the initiation of negotiations for real property, the head of the acquiring agency concerned shall establish an amount that the head of the acquiring agency believes to be just compensation for the property and shall make a prompt offer to acquire the property for no less than the full amount so established. In no event shall the amount be less than the agency's approved appraisal of the fair market value of the property.

Because "the policies set out in R.C. 163.59 are *not* prerequisites to the filing of an appropriation action," "[a]n agency's adherence or nonadherence to the appraisal and offer provisions in R.C. 163.59(C) and (D) would…not conclusively establish whether the agency satisfied the good-faith-offer prerequisite found in R.C.163.04(B)." (Emphasis in original.) *Moundbuilders* at ¶ 35. Nevertheless, the appraisal and offer provisions are relevant to our analysis. *See id.* (finding appraisal and offer provisions of R.C. 163.59(C) and (D) to be relevant to discussion of good-faith purchase offer).

{¶ 40} "The definition of 'good faith' is 'a state of mind consisting in honesty in belief or purpose,' 'faithfulness to one's duty or obligation,' or 'observance of reasonable commercial standards of fair dealing in a given trade or business.'" *Moundbuilders* at ¶ 31. "[A] person can demonstrate good faith through behavior that is reasonable in a particular context or that conforms with justified expectations," and "not just through a claim of having honest intentions." *Id.* Conversely, "a person can potentially demonstrate a lack of good faith by acting unreasonably or [in] failing to meet justified expectations." *Id.*

**{¶ 41}** In this case, the trial court found that the Village complied with the requirements of R.C. 163.04. Dismissing appellant's argument that the Village's good faith offer was not supported by any appraisal evidence, the trial court pointed out that "the Village offered $525,000 to acquire the Property, being $90,000 above the amount set forth in the appraisal report."

**{¶ 42}** On appeal, appellants complain that the offer of $525,000 was "untethered to any objective – or subjective – data that would allow the appellants to evaluate it. They claim that the appraisal "with an effective date of November 11, 2021, did not hold up or serve as a foundation for the good faith offer provided to [appellants] in September 2022." In making this argument, appellants do not cite a single statute or case requiring the Village to tie the offer to anything. Under the Revised Code, the Village was expected to make an offer that was at least the same price as the appraisal. It is undisputed that the Village's offer was greater than the figure quoted in the less-than-one-year-old appraisal. Testimony by Mayor Panning established that the Village wanted to provide a value that it thought was fair.

**{¶ 43}** Here, where the Village presented an appraisal with its offer, the offer was not less than the value quoted in the appraisal, and there was no evidence of dishonest intent or unreasonable behavior, we find that the trial court's finding of a good faith offer was supported by competent, credible evidence, and was not against the manifest weight of the evidence.

**{¶ 44}** Appellants' reliance on *The City of Willoughby Hills v. Andolsek*, 2003-Ohio-323 (3d Dist.) does not alter this conclusion. In that case, the trial court determined

14.

that Willoughby Hills' good faith offer was an abuse of discretion because "the City *did not attempt to obtain an appraisal*…prior to initiating negotiations with [the landowner]. *Id.* at ¶ 111. (Emphasis added.) Instead, the City merely relied on the county auditor's appraisal, which was five years old, and arbitrarily doubled that figure, and then downwardly adjusted the value by 10 percent. *Id.* at ¶ 2, 64, 111. Unlike in *Andolsek*, where Willoughby Hills *never* obtained an appraisal, the Village here *did* obtain an appraisal and, further, decided to offer more than the appraised value in an effort to reach a resolution with appellants.

{¶ 45} For the foregoing reasons, appellant's first assignment of error is found not well-taken.

## Necessity

{¶ 46} R.C. 163.09(B)(1) is applicable where, as here, "(1) the agency has filed a petition under R.C. 163.05 against a landowner to appropriate a 'parcel or contiguous parcels in a single common ownership, or interest or right therein,' and (2) the landowner has filed an answer in response to that petition denying the 'necessity for the appropriation' under R.C. 163.08." *Columbia Gas*, 2023-Ohio-1245, at ¶ 63. If applicable, R.C. 163.09(B)(1) requires the trial court to set a hearing to address any "matters relating to the right to make the appropriation, the inability of the parties to agree, or the necessity for the appropriation." *Id.*

{¶ 47} Regarding the element of necessity, an agency "must show by a preponderance of the evidence that the taking of the property is necessary, unless one of three circumstances in division (a), (b), or (c) [of R.C. 163.09(B)(1)] has occurred." *Ohio*

15.

*Power*, 2022-Ohio-4713, at ¶ 20. "'The "necessity" required in the exercise of the power of eminent domain does not require a showing of absolute necessity, but includes "that which is reasonably convenient or useful to the public."'" *Ohio Power Co. v. Duff*, 2020-Ohio-4628, ¶ 32, quoting *Ferencz v. Toledo*, 1988 WL 139615, *3 (6th Dist. Dec. 30, 1988), quoting *Giesy v. Cincinnati, Wilmington, and Zanesville RR. Co.*, 4 Ohio St. 308, 327 (1854). "Necessity includes present needs as well as future needs." *Erie-Ottawa-Sandusky Regional Airport Auth. v. Orris*, 1991 WL 254227, *4 (6th Dist. Sept. 13, 1991).

{¶ 48} Under R.C. 163.09(B)(1)(a), an agency "is entitled to a rebuttable presumption of necessity if the [governing board of the agency] declared by resolution 'the necessity for the appropriation.'" *Ohio Power*, at ¶ 20, quoting R.C. 163.09(B)(1)(a). Thus, "a determination that an appropriation is necessary for a public use will not be disturbed unless the property owner proves that the determination was the result of fraud, bad faith, or an abuse of discretion." *Wadsworth v. Yannerilla*, 2006-Ohio-6477, ¶ 9 (9th Dist.). An agency abuses its discretion if it acts unreasonably, arbitrarily, or unconscionably in making its necessity determination. *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217

{¶ 49} Appellants argue in their second assignment of error that the Village failed to identify a legitimate public purpose for its proposed taking, in that "an entirely speculative and contingent future use cannot sustain an appropriation claim."

{¶ 50} To be clear, the parties to this action do not dispute that providing a water supply to Village inhabitants is a public purpose and that appropriation for that purpose is

16.

not an abuse of discretion. *See* R.C. 719.01(M); *City of Dublin v. Beatley*, 2018-Ohio-3354, ¶ 24 (5th Dist.) (R.C. 719.01 establishes a statutory recognition that the purposes described therein are conclusively found to be a public purpose and appropriation for those purposes is not an abuse of discretion.).

{¶ 51} Instead, appellants complain that "the alleged public *use* of the Village is entirely contingent and prospective." (Emphasis added.) In *City of Norwood v. Horney*, 2006-Ohio-3799, the Ohio Supreme court determined that "[a] municipality has no authority to appropriate private property for only a contemplated or speculative use in the future." *Id.* at ¶ 100. It appears from this argument that appellants have conflated the terms "public use" and "necessity."

{¶ 52} Specifically, appellants argue that the evidence is insufficient to sustain the Village's appropriation action, because, "[p]er the testimony of the Village's own elected officials, there is no timeframe for the completion – or even the commencement – of the project and the Village's alleged necessity is that, ***at some undefined point in the future***, the Ohio EPA may require a public water source in the Village…. In addition, Mayor Panning could not offer any testimony as to when the municipal water project would be completed, whether 10 years from now, 20 years, ***or ever***." (Emphasis in original.)

{¶ 53} In this case, however, the trial court appropriately concluded that a rebuttable presumption of necessity arises from the Village's resolution of necessity set forth in Resolution 376. *See Ohio Power*, 2022-Ohio-4713, at ¶ 20, quoting R.C. 163.09(B)(1)(a). Such "prima facie evidence" of necessity can only be rebutted with

17.

evidence that the determination was the result of fraud, bad faith, or an abuse of discretion. *Wadsworth,* 2006-Ohio-6477, at ¶ 9.

{¶ 54} As evidence of the Village's bad faith in initiating and maintaining the appropriation action, appellants state that the Village "has no idea as to whether or not [the Property] is even feasible for the intended purpose" and is "without any idea as to what the project will cost or when it will be done. Moreover, the testimony of Village officials evidences that the Village undertook this proceeding with no ability to pay for the proposed infrastructure improvements and no plan to obtain the necessary working capital." Appellant's characterize this conduct as "objectively unreasonable."

{¶ 55} In support of their position, appellants cite R.C. 163.59(B), which requires that an appropriation be for a "defined public purpose that is to be achieved in a defined and reasonable period of time." We note, however, that at least one court has concluded that R.C. 163.59(B) "contemplates reasonably prospective projects." *See Wadsworth* at ¶ 14. In addition, a "public agency may 'provide for not only its present but also its prospective necessities' 'if it is not more than may in good faith be presumed necessary for future use within a reasonable time.'" *Columbus City School Dist. Bd. of Edn. v. Holding Corp. of Ohio*, 29 Ohio App.2d 114, 124 (10th Dist. 1971).

{¶ 56} In this case, Mayor Panning's testimony established that securing the Property is the first step, in a multi-step process, of building a water treatment facility and related infrastructure. He further testified that the Village "has always been interested [in] at some point being able to provide a public water source to its residents." In order to fulfill that goal, AOP was hired to conduct a visual analysis of the property, after which

18.

AOP "advised [the Village] that it would be a suitable source for a treatment facility and water supply." In addition, the Village obtained a laboratory analysis of the water to determine its suitability for use as drinking water. Following this analysis, the Village had evidence that the water was "clean."

{¶ 57} Panning also stated that based on AOP's recommendation to secure the water source prior to moving forward with site plans and engineering, it was the Village's intent to secure the source of the water. Panning specified that once the Property is secured, the Village plans to install water transmission infrastructure. Panning additionally testified that once the Village acquires the property, it plans "to move forward with soliciting proposals and design work, and the additional steps necessary to pursue providing water treatment to its citizens."

{¶ 58} Under the circumstances of this case, there is competent, credible evidence to show that the Village is working to provide for the prospective necessity of a public water source that may in good faith be presumed necessary for future use within a reasonable time. Appellants do not provide, nor has this court found, any legal authority that requires an appropriating agency to have full funding for, or a specific timeline for the completion of, its projects before taking action to appropriate property. Accordingly, we find no reason to overturn the trial court's determination that appellants failed to meet their burden of demonstrating bad faith, fraud, or an abuse of discretion by the Village. As the trial court's finding was not against the manifest weight of the evidence, appellants' second assignment of error is found not well-taken.

19.

**Conclusion**

**{¶ 59}** The judgment of the Wood County Court of Common Pleas is affirmed.

Appellants are to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Myron C. Duhart, J.

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.